### CLEAN AIR MARKETS GROUP, Plaintiff,

v.

**George E. PATAKI, in his capacity as Governor of the State of New York; Maureen O'Donnell Helmer, in her capacity as Chairman of the New York State Public Service Commission; Thomas J. Dunleavy, in his capacity as a Commissioner of the New York State Public Service Commission; James D. Bennett, in his capacity as a Commissioner of the New York State Public Service Commission; Leonard A Weiss, in his capacity as a Commissioner of the New York State Public Service Commission; Neal N. Galvin, in his capacity as a Commissioner of the New York State Public Service Commission; Defendants.**

No. 00–CV–1738.

United States District Court, N.D. New York.

April 9, 2002.

Couch White, LLP, Attorneys for Plaintiff, Albany, Paul A. Feigenbaum, Esq.

Hunton & Williams, Attorneys for Plaintiff, Washington, DC, Norman W. Fichthorn, Esq., Allison D. Wood, Esq.

Hon. Eliot Spitzer, Attorney General of the State of New York, Attorney for Defendant Pataki, Albany, Robert M. Rosenthal, Esq., Ass't Attorney General.

Office of the General Counsel, Public Service Commission of the State of New York, Attorneys for the Public Service Commission Defendants, Albany, Carl Patka, Esq., Diane T. Dean, Esq., Ass't Counsels, of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Clean Air Markets Group ("CAMG") challenges the facial constitutionality of New York's Air Pollution Mitigation Law as preempted by the Federal Clean Air Act under the Supremacy Clause and as violative of the Interstate Commerce Clause. Defendant Governor

George E. Pataki ("Pataki") and the Public Service Commission ("PSC") defendants Maureen O'Donnell Helmer, Thomas J. Dunleavy, James D. Bennett, Leonard A. Weiss, and Neal N. Galvin (collectively the "PSC defendants") separately move for summary judgment. CAMG opposes and cross moves for summary judgment. Oral argument was heard on June 22, 2001, in Albany, New York. Decision was reserved.

## II. BACKGROUND

The background facts as set forth below are undisputed or not challenged by the parties as presenting genuine issues of fact. While it is correct that many of the following facts are not material to the disposition of the instant motions, the background is helpful to the legal analysis.[1]

### A. Environmental Problem: Acid Deposition

Acid deposition, commonly called acid rain, has long been recognized as an environmental problem. Sulfates and nitrates in the atmosphere are deposited on the earth's surface as acid deposition. The two types of acid deposition are wet deposition, in the form of rain, snow, sleet, fog, and cloud water, and dry deposition in the form of gases, aerosols, and particles.

The atmospheric sulfates and nitrates are formed from sulfur dioxide, $SO_2$, and nitrogen oxides, $NO_x$, respectively. Sulfur dioxide and nitrogen oxides are emitted as byproducts from the combustion of fossil fuels. Sixty-seven percent of sulfur dioxide emissions are sourced from utilities that generate electricity using fossil fuels. Sulfur dioxide is also emitted from industrial fuel combustion and other sources such as motor vehicles. Fifty-three percent of the nitrogen oxides emitted are attributable to on- and off-road vehicles, while the remainder is from electric utilities and other industrial sources. The highest emissions of $SO_2$ and $NO_x$ emanate from sources in the Midwest and the East, including Iowa, Kansas, Illinois, Missouri, Indiana, Michigan, Minnesota, Ohio, Wisconsin, Alabama, Florida, Georgia, Kentucky, Mississippi, Tennessee, Maryland, Pennsylvania, West Virginia, Massachusetts, New Hampshire, New Jersey, and New York.

It is not surprising that acid deposition is a problem in these high-source states. Additionally, however, the atmospheric sulfates and nitrates, formed from the emissions of $SO_2$ and $NO_x$, can travel hundreds of miles depending upon wind conditions.

1. The facts as set forth were gleaned from the parties' Statements of Material Facts pursuant to Local Rule 7.1(a)(3) and responses thereto, as well as the affidavits with attached exhibits. *See* L.R. 7.1(a)(3) Statements; Simonin Aff.; Sistla Aff.; Biewald Aff.; Burtraw Aff.; Ertel Aff.; Hart Aff.; Ramdas Aff.; Trahan Aff.; Dean Aff.; Karalus Aff.; Zaborowsky Aff. Of particular note are the following: National Science & Tech. Council Comm. on Env't & Natural Res., May 1998 National Acid Precipitation Assessment Program Biennial Report to Congress: An Integrated Assessment (Simonin Aff. Ex. B); United States Envtl. Prot. Agency, Report to Congress: The Benefits & Costs of the Clean Air Act 1990 to 2010 (1999)(Simonin Aff. Ex. D); United States Envtl. Prot. Agency, Acid Deposition Standard Feasibility Study Report to Congress (1995)(Simonin Aff. Ex. F); New York State Dep't of Envtl. Conservation, A Policy for N.Y. State to Reduce Sulfur Dioxide Emissions Final Envtl. Impact Statement (Sistla Aff. Ex. D); New York State Dep't of Envtl. Conservation, State Acid Deposition Control Act of 1985 Report to the Governor & Legislature (1991)(Sistla Aff. Ex. E); Committee on Env't & Public Works, U.S. Senate, A Legislative History of the Clean Air Act Amendments of 1990 (1993)(Hart Aff. Ex. B); United States Envtl. Prot. Agency, Progress Report on the EPA Acid Rain Program (1999)(Hart Aff. Ex. Q); United States General Accounting Office, Acid Rain Emissions Trends & Effects in the Eastern U.S. Report to Congressional Requesters (2000)(Hart Aff. Ex. R).

It has been determined that emissions from New Jersey, Pennsylvania, Maryland, Delaware, Virginia, North Carolina, Tennessee, West Virginia, Ohio, Michigan, Illinois, Kentucky, Indiana, and Wisconsin contribute highly to acid deposition in New York State. These high-contributing states are referred to as "Upwind States."

Areas in New York State susceptible to acid deposition are the Adirondacks, Catskills, Hudson Highlands, Rensselaer Plateau, and parts of Long Island. The Adirondacks are particularly susceptible to acid deposition due to the thin, calcium-poor soils and igneous rocks. Acid deposition has negative effects upon surface water, visibility, forests, human health, and materials and structures. For example, acidification of surface water results in the loss of fish and other aquatic life, including the inability of some species to survive. Loss of fish then leads to decrease in other animal life, such as birds that would have fed on fish. It has been estimated that seventy percent of Adirondack lakes and streams are at risk for acidification due to acid deposition. Sulfate particles in the air reduce visibility and aggravate health problems such as asthma. Sulfate and nitrate deposition accelerates degradation of materials and structures, such as automobile paints, bridges, monuments, and historic buildings.

No one disagrees that acid deposition is insidiously deleterious anywhere. Moreover, it is extraordinarily destructive to the Adirondacks.

### B. Legislative Solutions

In response to the environmental problems caused by acid deposition, legislative solutions have been formulated at both the state and federal levels. The Federal Clean Air Act was first promulgated in 1955 and underwent substantial revisions in 1977 and again in 1990. *See generally* 42 U.S.C. §§ 7401–7671q (codifying the Clean Air Act as amended). New York's Environmental Conservation Law was enacted in 1972, to consolidate prior laws from as early as 1952 regarding the development, use, control, and conservation of the State's natural resources. *See generally* N.Y. Envtl. Conserv. L. §§ 1–0101 to 72–end (codifying state conservation laws); *see also* N.Y. Pub. Serv. L. § 66–k (codifying the New York Air Pollution Mitigation Law enacted in 2000). At issue here are the 1990 amendments to the Federal Clean Air Act and New York Air Pollution Mitigation Law.

### 1. Clean Air Act Amendments of 1990

Title IV of the Clean Air Act Amendments of 1990 is directed toward the control of acid deposition. *See* 42 U.S.C. §§ 7651–7651o. Under Title IV, the reduction of sulfur dioxide and nitrogen oxides emissions by electric utilities would be accomplished in two phases.

Phase I, effective January 1, 1995, applied only to the 263 electricity generating units ("units") with the highest emissions. Sulfur dioxide emissions were to be reduced using a "cap and trade" system. A cap on $SO_2$ emissions was set: approximately 5.7 million tons of $SO_2$ emissions by the 263 units would be permitted in 1995. Additional units participated voluntarily, bringing the total emissions permitted to 8.7 million tons by 445 units in 1995. Reductions in the permissible amount of emissions were made annually so that in 1999, the 398 participating units were allowed 6.99 million tons.

Only 2.65% of the original 5.7 million-ton cap applied to units in New York State. In contrast, 72.1% of the cap applied to units in Upwind States.

Each ton of $SO_2$ authorized for emission is considered an allowance. A base allocation of allowances was set for each unit, for each year. For example, if a unit was

given a base allocation of 50 allowances for 1995, it could legally emit 50 tons of $SO_2$ in that year. However, the allowances were freely tradeable, as in a commodities market. Thus, if a unit emitted less than its allocated tonnage of $SO_2$, it could sell or trade its extra allowances, either to a specific unit or to a general account such as a brokerage fund. A unit could also purchase allowances if it could not or did not reduce its emissions to below its base allocation.

The rules proposed by the Environmental Protection Agency ("EPA") to implement Title IV of the 1990 Amendments provided for nationwide free trading of allowances. New York State objected, preferring regionally restricted trading. New York argued that allowances should not be traded to the Upwind States, as they are a significant source of acid deposition in New York. New York's concern was that the Upwind States would not reduce emissions; rather, they would continue to emit pollutants at current rates and meet the requirements of Title IV by purchasing allowances from units located elsewhere. New York's argument was rejected, however, and the final regulations provided for free nationwide trading of allowances.

In addition to being bought, sold, or traded, allowances could be "banked" for use in a later year. In other words, 1995 vintage year allowances could be banked for use in 1996 or later years. Banking allowances may be advantageous as emissions allocations are reduced annually. Utilities could also speculate about the price of the allowances, selling at a higher price and waiting for a lower price at which to purchase the allowances that would be needed to cover its emissions.

At the end of each calendar year, a unit must surrender to the EPA a number of allowances equal to the $SO_2$ emitted by the unit in that year. Allowances are allocated by the EPA on a thirty year rolling basis, so that vintage year 2031 allowances were allocated in 2001. Although future vintage year allowances are now available for sale and trade, they cannot be used to surrender for emissions in earlier years. In other words, a vintage year 2010 allowance cannot be used for 2001 emissions. In this way, past vintage years' allowances and future vintage years' allowances are bought, sold, and traded by the utilities in order to most efficiently and cost-effectively meet the emissions reductions required by the Clean Air Act. The utilities must balance current and future $SO_2$ emissions reductions with the price of different vintage year allowances to best meet their individual unit requirements.

Phase II, effective January 1, 2000, applied to virtually all existing units and all new units, bringing more than 2,000 units within its ambit. Approximately 9.2 million allowances, permitting the emission of 9.2 million tons of $SO_2$, were allocated for the year 2000. Again, annual reductions were set, with a permanent cap of 8.95 million tons of $SO_2$ emissions permitted for the year 2010 and annually thereafter. The permanent cap reflects a fifty percent reduction from 1980 emission levels.

Rather than a cap and trade system for $NO_x$, an emission rate for each source was set. Utilities were permitted to average emissions across its boilers, but there was no trading of allowances as for $SO_2$.

Between 1995 and 2000 over 96 million transfers of $SO_2$ allowances were made nationwide. Transfers by New York units constituted 1.48% of the total, or 1.44 million transfers. In the year 2000, approximately 25 million transfers were made nationwide. New York transfers constituted only 67,500, or 0.27% of the total. From 1995 to 1998, 30.2 million allowances were allocated. Twenty-nine percent, or 8.7 million allowances, were not used. This translates to 8.7 million tons of $SO_2$ emis-

sions less than was permitted by Title IV. Midwestern states were allocated 18.5 million tons but emitted only 13.9 million tons. In addition to the significant reduction in $SO_2$ emissions, the EPA estimates that the cap and trade system resulted in a compliance cost reduction of 50% in Phase I and 20% in Phase II below that projected. Unfortunately, $NO_x$ emission rates have not decreased.

Title IV specifically reserved to states the authority to further regulate pollutant emissions. States may also regulate utility rates and charges.

## 2. New York Statutory Scheme

The PSC regulates New York's utility rates and service, including electricity generators and transmission and distribution companies. In 1994 the PSC required revenue from the sale of $SO_2$ allowances to be directed to deferral accounts for the eventual benefit of rate payers. In some instances, with PSC approval, $SO_2$ allowance revenues may be used as economic development incentives for new rate payers, such as a new generator that needs $SO_2$ allowances during start-up. Thus, in keeping with its regulatory role, the PSC has been tangentially involved in the administration of Title IV in New York State.

Evaluations of the effects of the reduced emissions required by and resulting from Title IV show that while some areas are recovering from acidification, the recovery in the Adirondacks is lagging. This is in part due to natural environmental factors, such as thin soil that is ineffective in neutralizing acid deposition. Continued $SO_2$ emissions at the rates permitted by Title IV would not permit the environmental restoration of the Adirondacks. Additional reductions in $SO_2$ emissions would be required.

In 1999 Pataki directed, by executive order, that New York electric generators collectively reduce $SO_2$ emissions to fifty percent of the amount permitted by the Clean Air Act, by January 2, 2007. Reduction of $SO_2$ emissions below the Clean Air Act allocations would result in New York units having additional $SO_2$ allowances available for transfer.

In response, New York enacted, in May 2000, the Air Pollution Mitigation Law, the stated purpose of which is to encourage New York utilities to protect sensitive areas from acid deposition and to "make prudent revenue decisions regarding their participation in the federal allowance credit trading programs established" by Title IV. Historical and Statutory Notes, N.Y. Pub. Serv. L. § 66–k (McKinney's Supp. 2001–2002). Written reporting to the PSC of all transfers of $SO_2$ allowances is mandatory. Under § 66–k the PSC assesses an air pollution mitigation offset equal to any sum received for the sale or trade of $SO_2$ allowances where such allowance goes to a unit in an Upwind State. § 66–k(2). The transfer need not be made directly to an Upwind State unit, but need only be available for later transfer to units in the proscribed states. In other words, any amount received for such allowance is forfeited to the PSC. Funds obtained by the offset are to be used to finance energy research and development. The only permissible way to avoid the offset is to attach a restrictive covenant to the transfer of $SO_2$ allowances that prohibits their later transfer to and usage in an Upwind State.

Attaching such restrictive covenant lowers the value of the allowance. Allowances that originate in New York State have a market price of 2.5 to 5% less than allowances from the other 47 states subject to Title IV.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers

to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

## B. Standing

■ The threshold issue of whether plaintiff CAMG has standing must be addressed at the outset. The burden of establishing the three elements required to demonstrate standing is upon the party invoking federal jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561,

112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The first element, suffering of an "injury in fact" requires a showing that a legally protected concrete and particularized interest was invaded. *Id.* at 560, 112 S.Ct. at 2136. The injury must be "actual or imminent, not conjectural or hypothetical." *Id.* (internal quotations omitted). The second element is causation: "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal quotations omitted). The third element requires that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotations omitted). To withstand a summary judgment motion based upon standing, the plaintiff must set forth specific facts, taken as true for the purposes of the motion, to establish each required element. *Id.* at 561, 112 S.Ct. at 2137 (internal quotations omitted).

■ An association will have standing to bring a law suit on behalf of its members, absent injury to the association itself, "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Thus, in order to withstand defendants' summary judgment motions, CAMG must set forth specific facts showing that a member would have standing, that the protection sought is for an interest germane to its purpose, and that the individual partic-

ipation of its members is not required. *See id.*

■ CAMG has set forth the following facts in order to establish standing. "CAMG's purpose is to promote and encourage the use of market-based incentives under the Clean Air Act, to work to ensure preservation of the ability to sell, purchase, and use emission allowances without restriction under Title IV as intended by Congress, and to uphold the right to receive full market value for $SO_2$ emission allowances." (Hart Aff. ¶ 1.)

NRG Energy, Inc. ("NRG"), an independent power producer headquartered in Minnesota, is a member of CAMG. (Ramdas Aff. ¶¶ 2–3, 5.) NRG owns and operates five projects in New York State representing 4,516 megawatts of electricity generating capacity. *Id.* ¶ 5. Accordingly, the EPA issues $SO_2$ allowances to NRG's New York State units. *Id.* ¶ 6. These $SO_2$ allowances are subject to the New York Air Pollution Mitigation Act, N.Y. Pub. Serv. L. § 66–k. *Id.* ¶ 7. NRG currently owns 1,788,014 $SO_2$ allowances that are subject to § 66–k, 70,000 of which are 2001 vintage year. *Id.* ¶ 10. Under § 66–k these $SO_2$ allowances are not freely tradeable as provided for by Title IV of the Clean Air Act, but must be restricted from sale in the Upwind States or be subject to a 100% penalty. *Id.* ¶ 8–10. NRG's 70,000 vintage year 2001 allowances would be worth about $11,900,000 if they had been allocated to any state other than New York State; their actual market value is between $11,305,000 and $11,424,000, or $476,000 to $595,000 less than unencumbered allowances. *Id.* ¶ 11. NRG's remaining 1,718,014 $SO_2$ allowances from other vintage years are also worth approximately 2.5 to 5 percent less than allowances allocated to units in other states. *Id.* ¶ 11; Ertel Aff. ¶ 7. Moreover, the restrictive covenant required by New York's law has disrupted the allowance market as a whole and has caused the withholding of some allowances issued to New York units from the market. (Ertel Aff. ¶ 8.)

CAMG has set forth uncontroverted facts establishing that NRG has suffered a diminution in value of its $SO_2$ allowances, an injury in fact. Defendants argue that NRG must actually sell $SO_2$ allowances in order to have suffered an injury in fact. The validity of this argument is questionable; however, the argument is negated because CAMG has set forth facts that NRG units have both bought and sold $SO_2$ allowances. (Karalus Aff. ¶ 6–7.) CAMG has also set forth uncontroverted facts establishing that the loss in value of NRG's $SO_2$ allowances was caused by New York's requirement that a restrictive covenant be attached to the allowances, or any sum received for their sale would be forfeited to the state. (*See* Ramdas Aff. ¶ 10.) CAMG has established that its member, NRG, suffered an actual injury in fact caused by New York's law, the first two elements required to demonstrate standing. CAMG has also established the third element, in that the value of NRG's allowances would no longer be diminished should New York's law be declared unconstitutional, so that the restrictive covenant requirement would no longer apply.

Thus, CAMG has set forth specific facts showing that its member, NRG, would have standing. *See Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. Further, the protection sought here is directly related to CAMG's purpose of promoting and encouraging the use of market-based incentives under the Clean Air Act, working to ensure preservation of the ability to sell, purchase, and use emission allowances without restriction under Title IV, and upholding the right to receive full market value for $SO_2$ emission allowances. *See id.;* Hart Aff. ¶ 1. Finally, no argument is made, nor is it apparent,

that the individual participation of CAMG's members is required. *See id.* Accordingly, CAMG has established its standing to pursue this litigation, and the defendants' motions for summary judgment on this basis must be denied.

### C. Preemption of the New York Law by the Clean Air Act

Pataki argues that New York's Air Pollution Mitigation Law is not preempted by Title IV because such regulation is at the heart of a state's police powers, there is no express preemption in Title IV, and the New York law does not conflict with the Clean Air Act. The PSC defendants' arguments essentially mirror those of Pataki. CAMG argues that the New York law is an invalid use of the police powers reserved to the states, and there is conflict between the New York law and Title IV.

■■■■ The Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985)(quoting *Gibbons v. Ogden,* 9 Wheat., 1, 211, 6 L.Ed. 23 (1824)); U.S. Const., Art. VI, cl. 2. Federal laws may supersede state law either expressly or by inference. *Id.* at 713, 105 S.Ct. at 2371. All state law in a particular field is preempted "where the scheme of the federal regulation is sufficiently comprehensive to make reasonable inference that Congress 'left no room' for supplementary state regulation." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). "Pre-emption of a whole field also will be inferred where the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

■■■■ Finally, even where federal law has not supplanted a whole field of state law, state law is preempted "to the extent that it actually conflicts with the federal law." *Id.* An actual conflict between state and federal laws occurs when compliance with both is physically impossible or when the "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

■■■■ The Clean Air Act does not expressly invalidate state laws on acid deposition. In fact, Congress specifically reserved to the states the primary authority to control air pollution. *See* 42 U.S.C. § 7401(a)(3). Additionally, states may adopt and enforce regulations limiting the emission of pollutants to the extent that such regulations are more stringent than the requirements of the Clean Air Act, subject to certain exceptions not relevant here.[2] *See id.* § 7416. These specific reservations of authority to the states preclude any inference "that Congress 'left no room' for supplementary state regulation" regarding air pollution control. *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2371 (internal quotation omitted); *see also Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 492, 107 S.Ct. 805, 812, 93 L.Ed.2d 883 (1987)(noting that the Clean Water Act's saving clause "negate[d] the inference that Congress 'left no room' for state causes of action"). Similarly, no inference can be made that the field of air pollution control is one in which "'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *See Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2371.

---

**2.** *See, e.g.,* 42 U.S.C. § 7543 (motor vehicles); § 7573 (aircraft).

■ The only remaining issue in the preemption analysis is whether the New York Air Pollution Mitigation Law "actually .conflicts with federal law." *See id.* There is no physical impediment to compliance with both the state and federal laws. *See id.* New York State units can accept the allowances allocated by the EPA, then buy, sell, trade, or bank such allowances within the parameters set by the New York law.

However, the trading restriction or alternate 100% penalty for which the New York law provides creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See id.* Title IV provides that $SO_2$ allowances "may be transferred among designated representatives of the owners or operators of [covered units] and *any* other person who holds such allowances." 42 U.S.C. § 7651b(b)(emphasis added). New York's restrictions on transferring allowances to units in the Upwind States is contrary to the federal provision that allowances be tradeable to *any* other person. Additionally, Congress considered geographically restricted allowance transfers and rejected it. (Hart Aff. ¶ 10 & Ex. B.) The EPA, in setting regulations to implement Title IV, also considered geographically restricted allowance trading and rejected it over New York State's objections. *Id.* ¶¶ 11–14 & Ex. D–I. The rejections of a regionally restricted allowance trading system illustrates the Congressional objective of having a nationwide trading market for $SO_2$ allowances. New York's regional restrictions on $SO_2$ allowance trading by New York units is an obstacle to the execution of that objective.

Pataki argues that the Air Pollution Mitigation Law is saved by 42 U.S.C. § 7416 in that it imposes a more stringent requirement for air pollution control or abatement, as expressly permitted. However, unlike Pataki's 1999 Executive Order setting lower ceilings on emissions than set by the Clean Air Act, the Air Pollution Mitigation Law sets no emissions requirements. It sets no requirements for air pollution control or abatement at all. *See* N.Y. Pub. Serv. L. § 66–k (requiring covenants restricting the transfer of $SO_2$ allocations from New York units to Upwind State units, or, alternatively, setting a 100% penalty for unrestricted transfers); *cf. Exxon Mobil Corp. v. United States EPA*, 217 F.3d 1246, 1249, 1256 (9th Cir.2000)(finding state regulation requiring a minimum oxygenate level of 3.5 percent in winter gasoline not preempted by the less stringent Clean Air Act provisions requiring a minimum of 2.7 percent). Rather, the New York law is a state regulation of federally-allocated $SO_2$ allowances. Further, it is a restriction on the nationwide trading system for which the Clean Air Act provides. It is insufficient to merely say that it imposes requirements for air pollution control, or that the goal is air pollution control or abatement. *See Int'l Paper Co.*, 479 U.S. at 494, 107 S.Ct. at 813. New York's Air Pollution Mitigation Law is preempted because it interferes with the Clean Air Act's method for achieving the goal of air pollution control: a cap and nationwide $SO_2$ allowance trading system. *See id.* (finding that a state law would circumvent the federal permit system and thus was preempted, although the state law shared the common goal of eliminating water pollution).

In addition to interfering with the nationwide trading of $SO_2$ allowances, the Air Pollution Mitigation Law would result in decreased availability of $SO_2$ allowances in the Upwind States. Restricted availability of $SO_2$ allowances could indirectly reduce emissions in the Upwind States. No doubt that the New York legislators had this in mind when the Air Pollution Mitigation Law was enacted. (*See* Pataki Mem. at 20.) However, the Clean Air Act permits

restrictions on emissions by a state in that state, but it does not permit one state to control emissions in another state. Thus, the "inevitable result" of laws such as New York's Air Pollution Mitigation Law would be the indirect regulation of allowance trading and emissions in other states, which could not be done directly. *See id.* at 495, 107 S.Ct. at 813.

Defendants also argue that the Air Pollution Mitigation Law is saved by 42 U.S.C. § 7651b. That section provides that nothing in the allowance trading program is to be "construed as requiring a change of any kind in any State law regulating electric utility rates and charges or affecting any State law regarding such State regulation or as limiting State regulation ... under such a State law." 42 U.S.C. § 7651b(f). In other words, section 7651b saves state laws that regulate utility rates. The Air Pollution Mitigation Law does not regulate utility rates and therefore is not saved by § 7651b. Additionally, if this saving clause were read so broadly as to permit states to enact laws pertaining in any way to electric utilities, as must be done to save the Air Pollution Mitigation Law as defendants wish, then each state could forbid or otherwise limit the transfers of allowances. Clearly such a result would be contrary to the Congressional intent for a nationwide transfer system for $SO_2$ allowances. *See, e.g.,* § 7651b(b)(providing that allowances may be transferred to "any other person").

The New York Air Pollution Mitigation Law actually conflicts with the Federal Clean Air Act. *See Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2371. Accordingly, it is preempted by the Clean Air Act and the EPA implementing regulations, *see id.,* and CAMG is entitled to judgment as a matter of law.

## D. Commerce Clause

 CAMG claims that the Air Pollution Mitigation Law violates the Commerce Clause, U.S. Const., Art. 1, § 8, cl. 3, because it is a protectionist statute that creates a barrier to the interstate movement of $SO_2$ allowances, a commodity. Defendants argue that it is not a protectionist statute because it burdens only in-state companies. Therefore, defendants contend, in evaluating the constitutionality of the law the *Pike* balancing test should be applied to find a valid exercise of its police power because the state interest in protecting its environment significantly outweighs the inconsequential burden it places on interstate commerce. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). CAMG argues that even following the balancing test the statute is unconstitutional because the legislative scheme does not accomplish the stated goal of reducing $SO_2$ emissions and acid deposition.

 States may validly exercise their police power to regulate intrastate commerce to the extent that such regulation is within the bounds imposed by the Commerce Clause. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 623, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). Protectionist and isolationist state laws are "virtually *per se* " invalid. *Id.* at 623–24, 98 S.Ct. at 2535. However, where there are credible legislative objectives and "no patent discrimination against interstate trade," the *Pike* balancing test is applied. *Id.* at 624, 98 S.Ct. at 2535. Thus, state laws enacted for a legitimate public purpose with only an incidental effect on interstate commerce are constitutional " 'unless the burden imposed is clearly excessive in relation to the putative local benefits.' " *Id.* (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. at 847).

The first step in the constitutional analysis is a determination of whether the state law "is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Id.*, 98 S.Ct. at 2536. A statute can be protectionist by virtue of not only the legislative ends, but also the legislative means. *Id.* at 626, 98 S.Ct. at 2537. Thus, regardless of the ultimate legislative purpose, even if laudable, a statute that discriminates against commerce is protectionist and violates the Constitution. *Id.* at 626–27, 98 S.Ct. at 2537. If the legislative means result in "isolating the State from the national economy," then the statute is unconstitutional despite a legitimate legislative goal. *Id.* at 627, 98 S.Ct. at 2537. Further, a state cannot validly legislate to "its own inhabitants a preferred right of access over consumers in other States" to its natural resources or to privately owned articles of trade. *Id.* In other words, a state cannot block imports from other states, nor exports from within its boundaries, without offending the Constitution. *See id.* at 626–628, 98 S.Ct. at 2537–38.

The purpose of the Air Pollution Mitigation Law is to "ensure that utility corporations sited in New York State make prudent revenue decisions regarding their participation in the federal allowance credit trading programs established" by Title IV and "to encourage sales and trades of pollution allowance credits that are beneficial to the sensitive resource areas of the state and thus, to the people of the state of New York." Historical and Statutory Notes, N.Y. Pub. Serv. L. § 66–k (McKinney's Supp.2001–2002). This purpose was based upon, inter alia, the legislative findings that acid deposition is harmful in enumerated ways to the sensitive resource areas of the state, proposed federal reductions in $SO_2$ allowances presumably would control acid deposition in those sensitive areas, and "in the absence of federal action the state must act to safeguard public health and to protect its environment, economy and infrastructure from irreparable damage from acid deposition." *Id.* The legislature also found that while the federal allowance trading program could reduce compliance costs, "such allowance trading programs must be structured to achieve necessary environmental and public health goals." *Id.*

The stated purpose may be read to promote the laudable goals of reduction of acid deposition in sensitive areas of New York State and to protect the environment and the public health. The underlying finding that the federal $SO_2$ allowance trading program must be structured to meet those goals indicates that the true purpose of the statute is to restructure the $SO_2$ allowance trading system. In fact, that is the means by which the legislature will pursue its goal of environmental and public health protection. Thus, it is the restructured allowance trading system set forth in § 66–k that must be evaluated to determine if it is protectionist or isolationist. *See City of Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2537.

Section 66–k imposes a 100% penalty upon any New York unit that transfers a $SO_2$ allowance that is freely transferable to the Upwind States. In other words, any gain realized from such a transfer is forfeited to the state. It is not speculative to conclude that no New York unit would make such a transfer. In fact, preventing transfers of $SO_2$ allowances from New York units to units in Upwind States is the means by which § 66–k would reduce acid deposition in the sensitive areas of the state, as evidenced by the restrictive covenant requirement. Thus, the legislative means of § 66–k discriminate against articles of commerce, $SO_2$ allowances, thereby "isolating [New York State] from the national economy." *See id.* at 626–27, 98

S.Ct. at 2537. The Air Pollution Mitigation Law "overtly blocks the flow of interstate commerce" at New York's borders. *See id.* at 624, 98 S.Ct. at 2535.

In addition, the law does not restrict or penalize the transfer of $SO_2$ allowances from one New York unit to another New York unit, despite the fact that New York units contribute between 13% and 38% of the acid deposition in the state. In this manner, the law gives a preferred right of access to $SO_2$ allowances to in-state units over units in the Upwind States and therefore is protectionist. *See id.* at 627, 98 S.Ct. at 2537.

Defendants argue that the statute is not protectionist because it burdens in-state units (with lower value allowances resulting from the restrictive covenant) rather than out-of-state interests. Defendants contend that the statute cannot be protectionist because it is aimed at protecting natural resources, not protecting in-state businesses. These arguments miss the point. Protectionism is about a state isolating itself from a common problem by restricting the movement of articles of commerce in interstate commerce. *See id.* at 627–28, 98 S.Ct. at 2537–38. Here, the common problem is cost-effectively meeting reduced $SO_2$ emissions requirements to reduce acid deposition. The Congress determined that a way of·helping electric utilities across the country approach the problem was to establish a nationwide system of trading $SO_2$ allowances, in the fashion of a commodities market. As the New York legislature recognized, allowance trading can decrease the cost of reducing $SO_2$ emissions. What New York has done with the Air Pollution Mitigation Law is to deem itself most affected by acid deposition and place restrictions on the trade of

$SO_2$ allowances to states it finds to be the highest sources of acid deposition within its borders. This it cannot do.

"It does not matter that the State has shut the article of commerce inside the State in one case and outside the State in the other. What is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *Id.* at 628, 98 S.Ct. at 2537–38. New York's explicit restriction on the transfer of $SO_2$ allowances to units in Upwind States erects such a barrier against the movement of interstate trade. *See id.* Accordingly, the Air Pollution Mitigation Law is a constitutionally invalid protectionist measure.

 Even if it were not considered protectionist legislation, it cannot be "fairly viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *See id.* at 624, 98 S.Ct. at 2536; *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. Initially this balancing test requires a determination that the local purpose of the statute is legitimate. *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. If the local purpose is legitimate, then the tolerability of the burden it imposes upon interstate commerce will depend upon "the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.* Consideration must be given to "'direct' and 'indirect' effects and burdens." *Id.*

Reducing acid deposition and thereby protecting the environment and the public health are legitimate local concerns. However, there is no direct connection between the law's requirements and the purported concerns being addressed.[3] The law,

---

**3.** Defendants also contend that the mitigation offset directly addresses the purpose of the statute by funding environmental and energy research. However, it is incomprehensible that any company would transfer unrestricted $SO_2$ allowances, resulting in loss of the allowance as well as any profit gained from the sale.

whether by restricting transfers of $SO_2$ allowances to the Upwind States or requiring forfeiture of sums received for unrestricted transfers, is meant to reduce the number of $SO_2$ allowances that are available to units in the Upwind States. Theoretically, fewer allowances being available will result in lesser $SO_2$ emissions. However, this theory is contradicted by actual practice: Midwestern states used 4.67 million fewer $SO_2$ allowances than they had available in 2000. Additionally, any reduction in $SO_2$ emissions in the Upwind States must result in less acid deposition in New York State in order to fulfill the goal of the Air Pollution Mitigation Law. There is also no guarantee that the law will reduce the number of allowances available in the Upwind States, since the remainder of the states are free to transfer any number of allowances to units in the Upwind States. Moreover, as the defendants concede, 97.7% of the allowances purchased by Upwind States were from states other than New York. The substantial disjunct between the law itself and its purpose undermines its legitimacy, particularly in light of the burden imposed upon interstate commerce.

The law restricts transfers of $SO_2$ allowances to Upwind States. It imposes upon instate units the entire cost of compliance, either by forfeiture of receipts from unrestricted transfers or by reduced value of restricted $SO_2$ allowances. It attempts to halt altogether transfers of $SO_2$ allowances from New York units to units in Upwind States. It does this in spite of a federal system designed for free nationwide transferability of $SO_2$ allowances. It imposes a burden upon interstate commerce.

Defendants contend that the burden on interstate commerce is inconsequential. In support of this contention, they point to the minimal number of allowances allocated to New York units when compared to the nationwide numbers. For example, in 1995 only 2.65% of the total allowances were allocated to New York units, and in Phase II only 2.99% are allocated to New York units. These statistics demonstrate the extent of the discrimination upon interstate commerce rather than establish that there is no discrimination. *See Wyoming v. Oklahoma*, 502 U.S. 437, 455, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1992)(striking down an Oklahoma law that required instate utilities to use at least 10% Oklahoma-mined coal).

Because a burden on interstate commerce has been demonstrated, defendants must now justify the law in terms of "local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Id.* (internal quotation omitted); *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. As set forth above, the local benefits flowing from the statute are tenuous at best. Moreover, defendants have not established that nondiscriminatory alternatives are unavailable. For example, would requiring New York units to further reduce $SO_2$ emissions result in a similar decrease in acid deposition? Thus, even under the *Pike* balancing test the Air Pollution Mitigation Law cannot pass constitutional muster.

## IV. CONCLUSION

CAMG has standing to pursue this suit by virtue of its member, NRG Energy, Inc. New York's Air Pollution Mitigation Law is preempted by Title IV of the Federal Clean Air Act. The Air Pollution Mitigation Law is protectionist legislation that violates the Commerce Clause of the United States Constitution. Even if it were not considered protectionist, the Air Pollution Mitigation Law violates the Commerce Clause because the burden it imposes upon interstate commerce is not justified by its purported purpose. No

material facts are disputed and CAMG is entitled to summary judgment as a matter of law. The Air Pollution Mitigation Law is null and void and its enforcement must be enjoined. Accordingly, it is

ORDERED that

1. The summary judgment motions brought by defendant Pataki and the PSC defendants are DENIED;

2. Plaintiff CAMG's cross motion for summary judgment is GRANTED;

3. The Air Pollution Mitigation Law, New York Public Service Law § 66–k, is preempted pursuant to the Supremacy Clause, U.S. Const., Art. VI, cl. 2, and therefore is null and void;

4. The Air Pollution Mitigation Law, New York Public Service Law § 66–k, violates the Commerce Clause, U.S. Const., Art. 1, § 8, cl. 3, and therefore is null and void; and

5. Defendants are permanently enjoined from enforcing or taking any action to enforce the Air Pollution Mitigation Law, New York Public Service Law § 66–k.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.