338 F.3d 82
 CLEAN AIR MARKETS GROUP, Plaintiff-Appellee,
v.
George E. PATAKI, in his official capacity as Governor of the State of New York, Maureen O'Donnell Helmer, in her capacity as Chairman of the New York State Public Service Commission, Thomas J. Dunleavy, in his capacity as a Commissioner of the New York State Public Service Commission, James D. Bennett, in his capacity as a Commissioner of the New York State Public Service Commission, Leonard A. Weiss, in his capacity as a Commissioner of the New York State Public Service Commission, and Neal N. Gavin, in his capacity as a Commissioner of the New York State Public Service Commission, Defendants-Appellants,
 No. 02-7519.
 No. 02-7569.
 United States Court of Appeals, Second Circuit.
 Argued: January 15, 2003.
 Decided: August 1, 2003.
 
 PETER LEHNER, Assistant Attorney General (Robert Rosenthal, Assistant Attorney General, Denise A. Hartman, Assistant Solicitor General, and Caitlin J. Halligan, Solicitor General, of counsel; Eliot Spitzer, Attorney General, on the brief), Albany, NY, for Defendant-Appellant George E. Pataki.
 DIANE T. DEAN, Assistant Counsel (Lawrence G. Malone, General Counsel, on the brief), Public Service Commission of the State of New York, Albany, NY, for Defendants-Appellants Helmer, Dunleavy, Bennett, Weiss, and Galvin.
 NORMAN W. FICHTHORN (Allison D. Wood, on the brief) Hunton & Williams, Washington, D.C. for Plaintiff-Appellee.
 Before: WINTER and CABRANES, Circuit Judges, and AMON,* District Judge.
 JOSÉ A. CABRANES, Circuit Judge.
 
 
 1
 Defendants appeal from an April 9, 2002 judgment of the United States District Court for the Northern District of New York (David N. Hurd, Judge) granting summary judgment to plaintiff-appellee Clean Air Markets Group ("CAMG"). The District Court held that New York's Air Pollution Mitigation Law, N.Y. Pub. Serv. L. § 66-k ("section 66-k"), is preempted by Title IV of the Clean Air Act Amendments of 1990 ("Title IV"), 42 U.S.C. §§ 7651-7651o, and therefore violates the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2. The District Court also concluded that New York's Air Pollution Mitigation Law violates the Commerce Clause of the Constitution. U.S. Const. art. 1, § 8, cl. 3.
 
 
 2
 For the following reasons, we agree with the District Court that section 66-k is preempted by the Clean Air Act, and we therefore decline to review the District Court's conclusion that section 66-k violates the Commerce Clause of the Constitution.
 
 BACKGROUND
 
 3
 We assume familiarity with the relevant facts, which have been set forth in detail by the District Court. See Clean Air Markets Group v. Pataki ("CAMG"), 194 F.Supp.2d 147, 151-54 (N.D.N.Y.2002). Accordingly, for purposes of this appeal we restate only the facts necessary to our disposition, viewing them in the light most favorable to the defendants, see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 4
 In 1990, Congress amended the Clean Air Act of 1970, 42 U.S.C. §§ 7401 et seq. Title IV of the Clean Air Act Amendments of 1990 has the express purpose of "reduc[ing] the adverse effects of acid deposition through reductions in annual emissions of sulfur dioxide." 42 U.S.C. § 7651(b). According to Title IV's statement of purpose, "it is the intent of [Title IV] to effectuate such reductions ... through ... an emission allocation and transfer system." Id. In other words, the purpose of Title IV is to implement a "cap-and-trade" system in order to reduce sulfur dioxide ("SO2") emission, which is a leading cause of "acid rain" and other forms of "acid deposition" that are harmful to the environment. Under the cap-and-trade system created by Title IV, electricity-generating utilities ("utilities") are each allocated a certain number of emission allowances per year, see 42 U.S.C. § 7651b, and each allowance authorizes the utility to emit one ton of SO2,see 42 U.S.C. § 7651a(3). Every successive year, the total cap on allowable SO2 emissions is reduced, and fewer allowances are allocated. See 42 U.S.C. § 7651c. Pursuant to the system created by Title IV, SO2 allowances "may be transferred ... [to] any other person who holds such allowances." 42 U.S.C. § 7651b(b) (emphasis added). By permitting the sale of unneeded allowances, the cap-and-trade system creates a financial incentive for utilities to reduce their SO2 emissions.
 
 
 5
 Title IV's cap-and-trade system seeks to minimize acid deposition, the most common form of which is acid rain. Acid deposition has been a particular problem in the Adirondack region of New York State. The thin, calcium-poor soils and igneous rocks in this area make it highly susceptible to acidification. Acid deposition in this region has caused substantial harm to aquatic life and other natural resources.
 
 
 6
 Because SO2 emissions can travel hundreds of miles in the wind, much of the acid deposition in the Adirondacks results not from SO2 emissions in New York, but, rather, from SO2 emissions in fourteen "upwind" states. These states include New Jersey, Pennsylvania, Maryland, Delaware, Virginia, North Carolina, Tennessee, West Virginia, Ohio, Michigan, Illinois, Kentucky, Indiana, and Wisconsin.
 
 
 7
 In 2000, the New York legislature sought to address this problem by passing the Air Pollution Mitigation Law, N.Y. Pub. Serv. L. § 66-k ("section 66-k"). Pursuant to this statute, the New York State Public Service Commission ("PSC") is required to assess "an air pollution mitigation offset" upon any New York utility whose SO2 allowances are sold or traded to one of the fourteen upwind states. N.Y. Pub. Serv. L. § 66-k(2). The amount assessed is equal to the amount of money received by the New York utility in exchange for the allowances. Id. Moreover, the assessment is made regardless of whether the allowances are sold directly to a utility in an upwind state or are subsequently transferred there. Id. Accordingly, in order to avoid the assessment, New York utilities must attach a restrictive covenant to any allowances they sell that prohibits their subsequent transfer to any of the fourteen upwind states. See N.Y. Pub. Serv. L. § 66-k(3).
 
 
 8
 Plaintiff-Appellant CAMG is an association of electricity generation companies, SO2 emissions allowance brokers, mining companies, and trade associations. On November 15, 2000, CAMG filed the instant action against Governor Pataki and the Commissioners of the New York Public Service Commission. The complaint sought to enjoin the enforcement of section 66-k on the grounds that it (1) is preempted by Title IV of the Clean Air Act Amendments of 1990 and (2) violates the Commerce Clause of the United States Constitution. On January 24, 2001, the defendants each moved for summary judgment. CAMG filed a cross-motion for summary judgment on March 26, 2001.
 
 
 9
 In an opinion and order filed on April 9, 2002, the District Court granted CAMG's motion for summary judgment, denied the defendants' summary judgment motions, and permanently enjoined the defendants from enforcing section 66-k. See CAMG, 194 F.Supp.2d at 163. As an initial matter, the Court held that CAMG has standing to sue because (1) at least one of its members had suffered an injury-in-fact caused by section 66-k that could be redressed by the injunction, (2) the interests at issue in the lawsuit are germane to CAMG's organizational purpose, and (3) the participation of CAMG's individual members in the lawsuit is not necessary. Id. at 155-57 (citing Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).
 
 
 10
 With respect to preemption, the Court first determined that section 66-k is not expressly preempted by Title IV. Id. at 157. Next, it held that Title IV is not "sufficiently comprehensive" to preempt all state law in the field of air pollution control. Id. Nevertheless, the District Court concluded that section 66-k was preempted because it "actually conflicts with" Title IV by creating "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in passing the Act. Id. at 158 (quoting Hillsborough County, Florida v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (internal quotation marks and citation omitted)). The Court reasoned that "New York's restrictions on transferring allowances to [utilities] in the Upwind States is contrary to the federal provision that allowances be tradeable to any other person." Id. It also noted that "Congress considered geographically restrict[ing] allowance transfers and rejected it," and that "[t]he EPA, in setting regulations to implement Title IV, also considered geographically restricted allowance trading and rejected it over New York State's objections." Id. (citations omitted). The District Court concluded that "[t]he rejections of a regionally restricted allowance trading system illustrates the Congressional objective of having a nationwide trading market for SO2 allowances" and "New York's regional restrictions on SO2 allowance trading by New York [utilities] is an obstacle to the execution of that objective." Id.
 
 
 11
 The District Court also rejected the defendants' argument that section 66-k is expressly permissible under two other provisions of the Clean Air Act. First, the Court determined that 42 U.S.C. § 7416, which reserves for the states the power to impose on their own utilities more stringent requirements for air pollution control or abatement than mandated by federal law, was not applicable. The Court reasoned that section 66-k "sets no requirements for air pollution control or abatement," but, rather, "is a restriction on the nationwide trading system for which the Clean Air Act provides." Id. It added that the Clean Air Act "does not permit one state to control emissions in another state" and "the inevitable result of laws such as [section 66-k] would be the indirect regulation of allowance trading and emissions in other states, which could not be done directly." Id. at 159 (internal quotation marks and citation omitted).
 
 
 12
 The District Court also rejected the defendants' reliance on 42 U.S.C. § 7651b(f), which provides in relevant part that "[n]othing in [Title IV] shall be construed as requiring a change of any kind in any State law regulating electric utility rates." The Court explained that section 66-k "does not regulate utility rates and therefore is not saved by § 7651b." CAMG, 194 F.Supp.2d at 159.
 
 
 13
 Having concluded that section 66-k (1) creates an obstacle to the execution of Title IV's objectives and (2) is not expressly permissible under any provision of Title IV, the District Court held that section 66-k was preempted by Title IV and, therefore, that its enforcement would violate the Supremacy Clause of the United States Constitution.
 
 
 14
 The District Court next considered CAMG's alternative argument that section 66-k violates the Commerce Clause of the Constitution. The Court concluded that section 66-k "is a constitutionally invalid protectionist measure" because "[its] explicit restriction on the transfer of SO2 allowances to [utilities] in Upwind States erects ... a barrier against the movement of interstate trade." Id. at 161; see also City of Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (holding that "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected"). The Court further held that, even if the statute were not protectionist, it would still violate the Commerce Clause because "it cannot be `fairly... viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental.'" CAMG, 194 F.Supp.2d at 161 (quoting City of Philadelphia, 437 U.S. at 624, 98 S.Ct. 2531); see also Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) ("Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.").
 
 
 15
 In light of its conclusion that section 66-k violates the Supremacy Clause and the Commerce Clause of the Constitution, the District Court denied defendants' motions for summary judgment, granted CAMG's cross-motion for summary judgment, and enjoined defendants from enforcing section 66-k. This timely appeal followed.
 
 DISCUSSION
 
 16
 We review the grant of summary judgment de novo. City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 45 (2d Cir.1988). A party is entitled to summary judgment whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 
 17
 On appeal, defendants first argue that the District Court erred in holding that section 66-k violates the Supremacy Clause of the Constitution.[1] The Supreme Court has instructed that the Supremacy Clause[2] "invalidates state laws that `interfere with, or are contrary to,' federal law." Hillsborough County, 471 U.S. at 712, 105 S.Ct. 2371 (quoting Gibbons v. Ogden, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). Federal law may supersede state laws under the Supremacy Clause in three ways. First, "Congress is empowered to pre-empt state law by so stating in express terms." Id. at 713, 105 S.Ct. 2371 (citation omitted). Second, preemption of all state law in a particular field "may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." Id. (internal quotation marks and citation omitted). Finally, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." Id. (emphasis added). Such a conflict necessarily arises where "`compliance with both federal and state regulations is a physical impossibility.'" Id. (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). Moreover, an actual conflict exists when a state law "`stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" in enacting federal legislation. Id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).
 
 
 18
 The District Court held that section 66-k is preempted by Title IV because section 66-k "`stands as an obstacle to the accomplishment and execution of the full purposes and objectives of [Title IV].'" CAMG, 194 F.Supp.2d at 158 (quoting Hillsborough County, 471 U.S. at 713, 105 S.Ct. 2371). Defendants disagree, arguing that section 66-k supports the ultimate purpose of Title IV by helping to protect natural resources.
 
 
 19
 The Supreme Court has held, however, that "[i]n determining whether [a state law] stands as an obstacle to the full implementation of [a federal statute], it is not enough to say that the ultimate goal of both federal and state law is [the same]." International Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (internal quotation marks omitted). Even where federal and state statutes have a common goal, a state law will be preempted "if it interferes with the methods by which the federal statute was designed to reach this goal." Id. (emphasis added).
 
 
 20
 There can be no doubt that section 66-k interferes with the method selected by Congress for regulating SO2 emissions. Title IV expressly states that "it is the intent of [Title IV] to effectuate [SO2 emission] reductions ... through ... an emission allocation and transfer system." 42 U.S.C. § 7651(b) (emphasis added). In creating this system, Congress sought to grant utilities "the opportunity to reallocate among themselves their total emissions reduction obligations in the most efficient and cost-effective way possible." S. Rep. 101-228, at 303 (1989), reprinted in 1990 U.S.C.C.A.N. 3385, 3686 (emphasis added). In the words of the District of Columbia Circuit: "The basic idea of [Title IV's allowance trading system] is that if polluters for which cutbacks are relatively costly can buy pollution entitlements from ones for which cutbacks are relatively cheap, the nation can achieve a much greater overall cutback for a given expenditure of resources (or achieve a given cutback for a lower expenditure)." Texas Mun. Power Agency v. EPA, 89 F.3d 858, 861 (D.C.Cir.1996) (emphasis added). In order to implement this scheme on a national scale, Title IV permits allowances to "be transferred ... [to] any other person who holds such allowances." 42 U.S.C. § 7651b(b) (emphasis added).
 
 
 21
 The legislative history of Title IV provides further support for the fact that Congress intended the allowance transfer system to be nationwide. In implementing Title IV, the House of Representatives initially passed a bill that would have divided the nation into two geographic regions and would have required the transferring utility and the receiving utility to have been located in the same region. See H. Rep. No. 101-490, at 372 (1989). This geographic restriction also appeared in the bill passed by the Senate Committee on Environmental and Public Works. S. 1630, 101st Cong. § 403(b) (1989). However, the bill passed by the Senate contained no geographic restrictions, instead providing for a national allowance trading system, S. Rep. 101-228, at 303 (1989), reprinted in 1990 U.S.C.C.A.N. 3385, 3686, and the bill that ultimately emerged from the House-Senate Conference, and that was signed by the President, also included no geographic restrictions on the allowance trading system, Pub.L. No. 101-549, 104 Stat. 2399, 2590-91 (codified at 42 U.S.C. § 7651b(b)). Instead, the enacted bill clearly states that allowances "may be transferred ... [to] any other person who holds such allowances," id., anywhere in the United States.
 
 
 22
 The regulations adopted by the Environmental Protection Agency ("EPA") in order to implement Title IV further support the conclusion that the nationwide allowance trading system is an essential element of Title IV. See Hillsborough County, 471 U.S. at 713, 105 S.Ct. 2371 ("[S]tate laws can be preempted by federal regulations as well as by federal statutes."); Freeman v. Burlington Broadcasters, Inc., 204 F.3d 311, 321-22 (2d Cir.2000) ("Federal regulations have the same preemptive force as federal statutes."). In particular, the EPA regulations expressly mandate that state programs for granting "acid rain permits" pursuant to Title V of the Clean Air Act Amendments "shall not restrict or interfere with allowance trading." 40 C.F.R. § 72.72(a). These regulations were adopted over the objection of New York State, which argued vigorously in favor of a scheme that permitted allowance trading to be geographically restricted. See New York State Comments on 40 C.F.R. part 73, The Allowance System Regulations, Docket No. A-91-43, Doc. IV-G-3, at 1-2 (Feb. 13, 1992). In rejecting New York's arguments, the EPA explained that "[t]he national transfer of allowances was clearly contemplated by the drafters of the act." Acid Rain Program: General Provisions and Permits, Allowance System, Continuous Emissions Monitoring, Excess Emissions and Administrative Appeals, 58 Fed. Reg. 3590, 3614-15 (Jan. 11, 1993). Accordingly, the EPA structured the regulations implementing Title IV to "create ... a national system of tradable pollution permits." Madison Gas & Elec. Co. v. EPA, 4 F.3d 529, 530 (7th Cir.1993).
 
 
 23
 Although section 66-k does not technically limit the authority of New York utilities to transfer their allowances, it clearly interferes with their ability to effectuate such transfers. First, by requiring utilities to forfeit one hundred percent of their proceeds from any allowance sale to a utility in an upwind state, section 66-k effectively bans such sales. Moreover, the only way for New York utilities to ensure that they will not be assessed pursuant to section 66-k is to attach to every allowance they sell a restrictive covenant that prohibits the subsequent transfer of the allowance to an upwind state. Because such a restrictive covenant indisputably decreases the value of the allowances, section 66-k clearly "restrict[s] or interfere[s] with allowance trading," 40 C.F.R. § 72.72(a). In sum, section 66-k impermissibly "interferes with the methods by which [Title IV] was designed to reach [the] goal" of decreasing SO2 emissions, and therefore it "stands as an obstacle" to the execution of Title IV's objectives. International Paper, 479 U.S. at 494, 107 S.Ct. 805 (emphasis added).
 
 
 24
 Defendants argue that, even if section 66-k "stands as an obstacle" to the execution of Title IV's objectives, see Hillsborough County, 471 U.S. at 713, 105 S.Ct. 2371, it does not "actually conflict" with federal law because it is expressly permitted by two other statutory provisions of the Clean Air Act. First, defendants draw our attention to 42 U.S.C. § 7416, a savings clause that preserves state authority "to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." Defendants argue that section 66-k is a "requirement respecting control or abatement of air pollution," id., that is not preempted because it "simply goes further than the relevant federal law," Pataki Br. at 26. But, as properly noted by the District Court, section 66-k does not set requirements for air pollution control or abatement within New York, but, rather, attempts to "control emissions in another state." CAMG, 194 F.Supp.2d at 159. Nothing in the language of 42 U.S.C. § 7416 permits such legislation.
 
 
 25
 Defendants also maintain that section 66-k is authorized by 42 U.S.C. § 7651b(f), which provides in relevant part that the allowance trading system "shall [not] be construed as requiring a change of any kind in any State law regulating electric utility rates and charges or affecting any State law regarding such State regulation or as limiting State regulation ... under such a State law." But section 66-k does not regulate "utility rates and charges" and it does not "affect[] any State law regarding" the regulation of "utility rates and charges." Accordingly, 42 U.S.C. § 7651b(f) does not save section 66-k from preemption.
 
 
 26
 In sum, section 66-k is preempted by Title IV of the Clean Air Act Amendments of 1990 because it impedes the execution of "the full purposes and objectives" of Title IV, see Hillsborough County, 471 U.S. at 713, 105 S.Ct. 2371, and because it is not otherwise authorized by federal law. Accordingly, section 66-k violates the Supremacy Clause of the United States Constitution.
 
 
 27
 In light of this holding, we need not review the District Court's conclusion that section 66-k also violates the Commerce Clause of the Constitution, and we express no view on the propriety of its Commerce Clause analysis.
 
 CONCLUSION
 
 28
 For the reasons stated above, the judgment of the District Court is affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable Carol B. Amon, of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 Defendants do not appeal the District Court's determination that CAMG has standing to bring this lawsuit
 
 
 [2]
 The Supremacy Clause states:
 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.
 U.S. Const. art. VI, cl. 2.