# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 08-2940

_____

|  |  |
|---|---|
| United States of America, | * |
|  | * |
| Appellee, | * |
|  | * |
| v. | * |
|  | * |
| Ignacio Montes-Medina, | * |
|  | * |
| Appellant. | * |

_____

No. 08-2970

_____

Appeal from the United States
District Court for the
District of Nebraska.

|  |  |
|---|---|
| United States of America, | * |
|  | * |
| Appellee, | * |
|  | * |
| v. | * |
|  | * |
| Carlos A. Vega-Toscano, also | * |
| known as Jose, | * |
|  | * |
| Appellant. | * |

[PUBLISHED]

_____

Submitted: April 17, 2009
Filed: July 7, 2009
_____

Before LOKEN, Chief Judge, HANSEN and COLLOTON, Circuit Judges.
_____

HANSEN, Circuit Judge.

Following an undercover narcotics investigation involving controlled purchases of methamphetamine, a six-count indictment charged Ignacio Montes-Medina (Montes-Medina) and Carlos A. Vega-Toscano (Vega-Toscano), together with two others, with various drug trafficking crimes. Vega-Toscano entered a guilty plea to one count of possession with intent to deliver methamphetamine, and a jury convicted Montes-Medina on one count of conspiracy to distribute methamphetamine and one count of possession with intent to distribute methamphetamine. The district court[1] sentenced both Vega-Toscano and Montes-Medina to 188 months of imprisonment. Vega-Toscano appeals his sentence, and Montes-Medina appeals the denial of his suppression motion, his convictions, and his sentence. We affirm.

I.

The evidence at Montes-Medina's trial demonstrated that in the fall of 2006, law enforcement agents used Sergio Zamarripa (Zamarripa) as a cooperating informant in controlled purchases of methamphetamine in Grand Island, Nebraska. In October 2006, Zamarripa purchased methamphetamine in a controlled buy from Ramon Schachta, who had initially purchased it by contacting Montes-Medina and taking

_____

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

delivery from Vega-Toscano. Zamarripa testified that he first met Montes-Medina in November 2006. By telephone, Zamarripa had arranged to meet Montes-Medina and Vega-Toscano at Zamarripa's house. Montes-Medina and Vega-Toscano arrived in a maroon truck, and Montes-Medina identified himself as the boss in their methamphetamine trade. Zamarripa told the two men that he wanted to work with them. Montes-Medina then gave Zamarripa a small amount of methamphetamine from his pocket as a sample and indicated that the price per ounce was $1,000. They exchanged telephone numbers, and Zamarripa later called and negotiated a deal with Montes-Medina to purchase one ounce of methamphetamine for $800 at the Five Points Car Wash in Grand Island. On December 12, 2006, Zamarripa, under law enforcement surveillance, went to the Five Points Car Wash for the negotiated transaction. Vega-Toscano arrived alone with the methamphetamine and fronted the drugs, allowing Zamarripa to pay later. Law enforcement officers then followed Vega-Toscano's vehicle, which parked at 229 Darr Street in Grand Island.

The following week, Zamarripa telephoned Montes-Medina to negotiate another transaction, and they agreed it would take place at the Capital Car Wash in Grand Island on December 19, 2006. Law enforcement officers fitted Zamarripa with a wire. He made a recorded call to Montes-Medina using the number Montes-Medina had given him. Law enforcement officers also simultaneously conducted surveillance at 229 Darr Street. There, they observed two people enter a maroon truck and drive off. Officers followed the truck, losing it once but relocating it at another residence, 415 East Hall, in Grand Island. The officers observed two adult males in the driveway enter the truck and drive toward Capital Car Wash, and Zamarripa identified them as Montes-Medina and Vega-Toscano. Vega-Toscano and Montes-Medina arrived at the car wash in the maroon truck, and both entered Zamarripa's vehicle to negotiate and carry out the deal. Montes-Medina instructed Vega-Toscano to retrieve the methamphetamine from the maroon truck, which he did, and Montes-Medina also gave Zamarripa a smaller quantity of methamphetamine of a different quality. A car wash employee then instructed them to leave.

-3-

Zamarripa again recorded a telephone conversation with both Montes-Medina and Vega-Toscano, arranging another controlled purchase. Zamarripa arranged to purchase a kilo of methamphetamine on December 27, 2006, at the Kohl's department store parking lot in Grand Island. Montes-Medina and Vega-Toscano were waiting there without the kilo (2.2 pounds) when Zamarripa arrived, but they promised Zamarripa they could get a half pound of methamphetamine in about 15 minutes, and Montes-Medina set the price at $7,500. They agreed to meet for this deal at another car wash on Locust Street, and Montes-Medina and Vega-Toscano left the parking lot in a green Toyota Celica. Prearranged surveillance units at Kohl's were reassigned. Investigator Pederson and Detective Witt drove to 415 East Hall Street where they observed the green Toyota Celica in the driveway. They waited for the two men to come out of the house and get into the vehicle, and they followed it to the car wash, where the passenger, Vega-Toscano, alighted and walked toward the car wash. Seeing something in his waistband, officers decided to arrest Vega-Toscano as he approached the car wash. During the pat-down, a package of 222.68 grams of methamphetamine fell from his pant leg; the weight being just shy of one-half pound.

Investigators Rick Conrad and Scott Javins were in a second surveillance unit sent to the car wash on December 27, 2006. They observed the passenger get out of the green Toyota and saw the driver of the car park approximately a block away from the car wash, exit the vehicle, and enter a residence. The owner of the residence opened the door to the officers and pointed out Montes-Medina on the couch. The officers found no drugs on his person, but he was in possession of the cell phone bearing the number that Zamarripa had been calling to arrange the purchases. They arrested Montes-Medina.

Following the arrests, Investigator Mark Dreher applied for and obtained a search warrant for the residence located at 415 East Hall, from which Montes-Medina and Vega-Toscano twice had been seen leaving prior to methamphetamine deals with Zamarripa. Investigator Dreher's affidavit indicated that a cooperating individual had

purchased methamphetamine from two Hispanic males, that the affiant had prior knowledge of the two Hispanic males, that they went to this residence in a green Toyota Celica after making arrangements to sell the cooperating individual half a pound of methamphetamine, and that Investigator Jim Pederson had observed them exit the residence at 415 East Hall, leave in the green Toyota, and drive to the area of the car wash where they were arrested. Pursuant to the warrant, officers seized several small plastic bags containing a substance that proved to be methamphetamine in various quantities and purity levels.

Montes-Medina moved to suppress the evidence seized as a result of the search, challenging the affidavit and the finding of probable cause on the grounds that material omissions and a lack of specificity as to the cooperating individual's reliability rendered the warrant lacking in probable cause. The district court denied the motion to suppress. Vega-Toscano entered a guilty plea to Count 5, charging possession with intent to deliver 50 grams or more of methamphetamine.[2] See 18 U.S.C. § 2; 21 U.S.C. § 841(a)(1). Montes-Medina proceeded to trial, after which the jury convicted him on Count 1 of conspiracy to distribute 50 to 500 grams of a mixture or substance containing methamphetamine, see 18 U.S.C. § 2; 21 U.S.C. § 846; and on Count 5 of possession with intent to distribute 50 to 500 grams of a mixture or substance containing methamphetamine and 50 grams or more of actual methamphetamine, see 18 U.S.C. § 2; 21 U.S.C. § 841(a)(1).

At Vega-Toscano's sentencing, the Government attributed to him a total quantity of 155.18 grams of actual methamphetamine based on laboratory reports. The Government and Vega-Toscano stipulated that the purity analyses of the various quantities comprising that total are subject to a 10% margin of error. The Presentence Investigation Report (PSR) recommended a base offense level of 34 based upon the

---

[2]Vega-Toscano also pleaded guilty to the forfeiture allegations of Count 6, but the Government moved to dismiss this count, and the district court granted the motion. It is not at issue in this appeal.

drug quantity, a two-level adjustment for obstruction of justice, and a criminal history category I, resulting in an advisory Guidelines sentencing range of 188 to 235 months of imprisonment. Vega-Toscano objected to the base offense level. The Sentencing Guidelines provide that the break point between a base offense level of 32 and a level 34 is 150 grams of actual methamphetamine. See U.S. Sentencing Guidelines Manual (USSG) §§ 2D1.1(c)(3) & (4) (2007). Vega-Toscano argued that he must be given the benefit of the 10% margin of error in the quantity determination, which would result in a quantity less than 150 grams and would yield the lower advisory Guidelines range. The district court overruled the objection, finding that a base offense level 34 was appropriate. The district court sentenced Vega-Toscano at the low end of the applicable Guidelines range to 188 months of imprisonment.

Montes-Medina's sentencing calculation also began at base offense level 34. The district court overruled his objection to a two-level enhancement for obstruction of justice. The PSR recommended the enhancement because Montes-Medina had called Vega-Toscano to testify knowing he would lie. The district court found that Vega-Toscano had committed perjury on at least eight occasions at trial, testifying that Montes-Medina was never involved in the distribution of methamphetamine and asserting that Montes-Medina's voice is not on the recording of negotiations for the delivery of methamphetamine on December 27, 2006. The district court also found circumstances indicating that Montes-Medina knew Vega-Toscano would lie on his behalf. With this enhancement, the resulting advisory sentencing range was 188 to 235 months of imprisonment, and the district court imposed a sentence of 188 months of imprisonment.

II.

A.

Vega-Toscano challenges his sentence, arguing solely that he should have received the benefit of the 10% margin of error in the drug quantity determination stipulated to by the Government, which in turn would have yielded a lower advisory Guidelines range of 151 to 188 months. He does not contest on appeal the enhancement for obstruction of justice. We review criminal sentences for an abuse of discretion, first ensuring that the district court committed no significant procedural error, such as failing to calculate the Guidelines sentencing range properly, and second, for substantive reasonableness. Gall v. United States, 552 U.S. 38, 128 S. Ct. 586, 597 (2007); United States v. Vega-Iturrino, 565 F.3d 430, 432-33 (8th Cir. 2009). In determining whether a sentencing court has committed procedural error, we review the court's application of the Guidelines de novo and its findings of fact, such as the findings regarding drug quantity, for clear error. United States v. Clarke, 564 F.3d 949, 955 (8th Cir. 2009). We are permitted on appeal to apply a presumption of reasonableness to a properly calculated within-Guidelines sentence. Rita v. United States, 551 U.S. 338, 347 (2007).

The district court did not commit procedural error in its calculation of the drug quantity attributable to Vega-Toscano. At sentencing, the Government bears the burden of proving drug quantity by a preponderance of the evidence. United States v. Atkins, 250 F.3d 1203, 1211 (8th Cir. 2001). The Government presented evidence supported by laboratory reports that a quantity of 155.18 grams of methamphetamine was attributable to Vega-Toscano, and both parties stipulated to the 10% margin of error. The district court, as the fact finder, was free to rely upon the laboratory results, and that finding is supported by a preponderance of the evidence. There was no evidentiary basis for applying the margin of error in one direction or the other. As with any evidence offered by either party at sentencing, the court, as the finder of fact, is free to accept or to reject the evidence in whole or in part. We have held that even

-7-

"[w]hen no quantity has been recovered, the government may prove the purity of quantities attributed to the defendant by circumstantial evidence, for example, a conspirator's reliable testimony . . . or an expert's testimony as to the normal purity of methamphetamine produced in a lab." United States v. Houston, 338 F.3d 876, 879 (8th Cir. 2003). The record here includes laboratory test results of the methamphetamine actually recovered, and Vega-Toscano's only argument is that he should receive the benefit of the margin of error to lower the total amount. While the district court was free to apply the stipulated 10% margin of error in either direction, this is not a case where a district court applied a margin of error in a manner that raised the drug quantity to a higher offense level. We hold only that the district court was not required to use the lab's margin of error to drive the drug quantity down into a lower offense level and that the district court's quantity determination in this case is well supported by the record. "In reviewing the drug quantity finding for clear error, we must affirm unless the entire record firmly convinces us that a mistake has been made." Houston, 338 F.3d at 878. Nothing in this record convinces us that a mistake has been made. Finding no significant procedural error in the district court's calculation of the advisory Guidelines range, we apply the presumption of reasonableness, which has not been rebutted, and affirm this bottom-of-the-range sentence as to Vega-Toscano.

## B.

### 1.

Montes-Medina first challenges the district court's denial of his suppression motion on grounds that the warrant application did not establish probable cause. We review the district court's findings of fact for clear error and its conclusions of law de novo. United States v. Hart, 544 F.3d 911, 913-14 (8th Cir. 2008), cert. denied, 129 S. Ct. 2069 (2009). The Fourth Amendment requires probable cause to be shown for the issuance of a warrant. Id. at 914. "Where there is no evidentiary hearing before the magistrate judge, the probable cause determination must be based upon only the information which is found within the four corners of the affidavit." United States v.

Hudspeth, 525 F.3d 667, 674 (8th Cir. 2008) (internal marks omitted). We must consider the totality of the circumstances to determine whether an affidavit is sufficient to demonstrate probable cause. Hart, 544 F.3d at 914. Probable cause exists if the warrant application and affidavit describe circumstances showing "a fair probability that contraband or evidence of a crime will be found in a particular place," and our duty on appeal "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (internal marks omitted).

A defendant may be entitled to an evidentiary hearing in the district court to attack the veracity of the warrant affidavit if "the defendant makes a substantial preliminary showing" that a false statement knowingly, intentionally, or recklessly was included in the warrant affidavit and was "necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155-56 (1978). The defendant must make this showing by supporting the allegations with an offer of proof. See United States v. DeBuse, 289 F.3d 1072, 1075 (8th Cir. 2002). When information is alleged to have been omitted from an affidavit, the warrant may be invalid if the defendant can prove by a preponderance of the evidence that the applying officer omitted facts in reckless disregard of whether the omission made the affidavit misleading and that, if supplemented by the "clearly critical" information omitted, the affidavit would not have supported a finding of probable cause. United States v. Williams, 477 F.3d 554, 557 & 559 (8th Cir. 2007) (internal marks omitted).

The district court detailed several important assertions from the affidavit and concluded that, when read in a commonsense manner, they are sufficient to support a finding of probable cause. We agree. The affidavit recounts the basic facts that a cooperating individual communicated with two Hispanic males who had previously contacted him to arrange a methamphetamine purchase. The Hispanic males agreed to sell various amounts of methamphetamine to the cooperating individual and the affiant stated he had prior knowledge that the suspects had gone to the 415 East Hall

residence to retrieve methamphetamine in the past. On this current occasion, Investigator Jim Pederson saw them exit the residence, enter the green Toyota, and drive to the prearranged place for the controlled purchase. One of the Hispanic males was arrested there with approximately one-half pound of methamphetamine, and the affidavit states that the two Hispanic males had told the cooperating individual that "all the rest of the Methamphetamine was at the house that they had to go get it from." (Montes-Medina's Add. at 8, Dreher Affidavit at 2.)

The district court correctly viewed the affidavit in "'a practical, commonsense'" manner, considering the totality of the circumstances. See United States v. Carter, 413 F.3d 712, 714 (8th Cir. 2005) (quoting Gates, 462 U.S. at 238). When read as a whole, it is sufficiently clear that the affidavit's references to a residence and a house are references to the 415 East Hall address that is the subject of the warrant. The cooperating individual's reliability can be found adequate from the detail of the information and the controlled buys referenced. "[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first hand, entitles his tip to greater weight than might otherwise be the case." Gates, 462 U.S. at 234. The officer in this case reliably corroborated the cooperating individual's account by monitoring the negotiation of two controlled purchases, observing the suspects at the residence before the controlled buys, and setting forth actions by the cooperating individual implicating himself in criminal activity, all of which lends support to the finding of probable cause in the warrant application. See United States v. Pennington, 287 F.3d 739, 742-43 (8th Cir.), cert. denied, 537 U.S. 1022 (2002).

Additionally, Montes-Medina did not demonstrate that the affidavit included any deliberate or reckless falsehoods. His assertion that the affidavit omitted information that the officers had entered the residence prior to seeking a warrant does not present information that was clearly critical to or that affected the probable cause

determination. Accordingly, the district court did not abuse its discretion in denying a Franks hearing. See United States v. Crissler, 539 F.3d 831, 833-34 (8th Cir. 2008).

2.

Montes-Medina challenges the sufficiency of the evidence to sustain his convictions for conspiracy and the possession of methamphetamine with intent to distribute, asserting that there was no evidence that he ever actually possessed any methamphetamine. We review a challenge to the sufficiency of the evidence de novo, viewing the evidence and all reasonable inferences in the light most favorable to the verdict. United States v. Farrell, 563 F.3d 364, 366 (8th Cir. 2009). We will reverse only if no reasonable jury could have found him guilty beyond a reasonable doubt. Id.

After reviewing the lengthy trial transcript, summarized above, we have no trouble concluding that the evidence in this case is sufficient to sustain both of Montes-Medina's convictions. "A conspiracy conviction requires proof that the defendant entered into an agreement with at least one other person to sell methamphetamine," and "[a] conviction for possession with intent to distribute requires knowing possession of the methamphetamine." United States v. Salvador, 426 F.3d 989, 992 (8th Cir. 2005) (internal marks omitted). "Proof of constructive possession is sufficient to satisfy the element of knowing possession." Id. (internal marks omitted). There was ample evidence from which a jury could conclude that Montes-Medina acted jointly with Vega-Toscano in conspiring to sell methamphetamine to Zamarripa. That evidence includes Zamarripa's testimony, law enforcement officers' testimony, recorded telephone conversations with Montes-Medina's voice negotiating the deals, and controlled purchases with Montes-Medina present or nearby. Indeed, the evidence strongly indicated that Montes-Medina was in charge of the drug deals. While Montes-Medina was not arrested in actual possession of methamphetamine, the evidence supports a finding beyond a reasonable doubt that he was in constructive possession of the methamphetamine that Vega-

-11-

Toscano delivered. He negotiated the transactions with Zamarripa, set the prices for the methamphetamine, and was seen going into and coming out of the residence at 415 East Hall prior to the controlled buys. Further, he was in the vehicle with the methamphetamine on more than one occasion, and he was present during at least one of the transactions. See id. at 992-93 (finding constructive possession where defendant was present at a transaction, he was in the car that contained the drugs, and testimony indicated he knew the location of the drugs). "Knowledge of the presence of contraband, plus the ability to control that contraband either directly or through another person establishes constructive possession." Id. at 993. We conclude that the evidence is sufficient to sustain Montes-Medina's convictions on both drug charges.

3.

Finally, Montes-Medina argues that the district court erred in enhancing his base offense level at sentencing on the ground that he engaged in the obstruction of justice. See USSG § 3C1.1. "We give great deference to a district court's decision to impose an obstruction of justice enhancement" and will not reverse unless the findings are insufficient. United States v. Hance, 501 F.3d 900, 911 (8th Cir. 2007) (internal marks omitted). The district court must find the predicate facts supporting an enhancement for obstruction of justice by a preponderance of the evidence, and we review those findings for clear error. United States v. Aleman, 548 F.3d 1158, 1163 (8th Cir. 2008), cert. denied, 77 U.S.L.W. 3656 (U.S. Jun. 1, 2009) (No. 08-10151). Suborning perjury and providing materially false information to a judge is conduct that amounts to an obstruction of justice. See USSG § 3C1.1, comment. (n.4); see also United States v. Negrete, 537 F.3d 918, 921 (8th Cir. 2008) (holding the obstruction enhancement is appropriate "if the defendant has committed perjury or suborned perjury by another witness" (internal marks omitted)). The district court pointed to eight very specific portions of Vega-Toscano's testimony to support the finding that Vega-Toscano committed perjury at the trial. (See Montes-Medina's Sent. Tr. at 28-30.) In those portions of the transcript, Vega-Toscano testified repeatedly that he was alone during recorded telephone conversations that obviously involve

three distinct voices, one of which was identified as the voice of Montes-Medina. He also testified that he was alone with Zamarripa in a vehicle during a controlled buy when Zamarripa and law enforcement officers all observed Montes-Medina's presence. The district court's ultimate finding that Vega-Toscano intentionally lied to the jury is supported by these specific references to his testimony. See United States v. Whiting, 522 F.3d 845, 850 (8th Cir. 2008) (concluding that the district court adequately supported the obstruction enhancement by pointing to specific parts of the testimony it found to be intentional lies). The district court also found that Montes-Medina knew Vega-Toscano would lie on the stand, pointing again to specific statements in the record and reasonable inferences from that evidence. The record shows that Montes-Medina's counsel established that counsel had never spoken to the witness, yet Montes-Medina's counsel represented to the court that he knew Vega-Toscano would testify that Montes-Medina was not involved. The district court drew the reasonable and permissible inference that Montes-Medina and Vega-Toscano, housed at the same jail, had spoken at the jail about the content of Vega-Toscano's proposed testimony and that Montes-Medina had told his lawyer what that testimony would be. We conclude that the district court did not clearly err in applying the obstruction of justice enhancement. Finding no significant procedural errors in the district court's calculation of the advisory Guidelines range, we apply the unrebutted presumption of reasonableness and affirm Montes-Medina's sentence.

III.

Accordingly, we affirm the judgment of the district court in both cases.

_____

-13-