NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 221022-U

NO. 4-22-1022

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 14, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DONNELL ALLEN TAYLOR, | ) | No. 22CF94 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Steigmann and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) trial counsel did not render
ineffective assistance by failing to move to suppress evidence obtained from a
search warrant where the warrant application established a sufficient nexus
between criminal activity and the premises searched and (2) counsel did not
render ineffective assistance by eliciting testimony of other crimes or bad conduct
or in allowing the jury to be given a limiting instruction concerning the conduct
where (a) the acts were presumed to be trial strategy and (b) to the extent they
could not be deemed reasonable strategy, defendant did not show prejudice.

¶ 2    In February and March 2022, the State charged defendant, Donnell Allen Taylor,

in part with unlawful delivery of a controlled substance (720 ILCS 570/401(d)(i) (West 2022)),

unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(d)(i)

(West 2022)), and unlawful delivery of a look-alike substance (720 ILCS 570/404(b) (West

2022)).  In July 2022, a jury found defendant guilty.

¶ 3        On appeal, defendant contends his counsel rendered ineffective assistance when counsel (1) failed to file a motion to suppress evidence seized from an apartment defendant shared with his girlfriend, (2) elicited testimony about irrelevant other crimes or bad conduct, and (3) did not object to an instruction limiting the jury to considering the evidence for purposes of establishing identity.

¶ 4        We determine (1) the warrant application established a sufficient nexus between criminal activity and the premises searched and (2) counsel's elicitation of testimony about other crimes or bad conduct and decision not to object to a limiting instruction were presumed to be trial strategy.  To the extent counsel's conduct could not be deemed reasonable strategy, defendant did not show prejudice.  Accordingly, defendant failed to show ineffective assistance of counsel, and we affirm.

¶ 5                              I. BACKGROUND

¶ 6                        A. The Search-Warrant Complaint

¶ 7        On January 26, 2022, Detective Ryan Strebing of the Bloomington Police Department submitted a sworn complaint for a "second surveillance search warrant" of Apartment No. 7 at 1708 Springfield Road in Bloomington, Illinois.  The items sought included controlled substances, drug paraphernalia, currency, electronic devices, documents of residency, and other evidence of drug sales.  In the complaint, Strebing averred he regularly worked with other law enforcement personnel investigating the sale and distribution of illegal drugs.  During the course of an ongoing investigation, he had been working with a confidential source (the source).  Strebing included surveillance logs and narrative reports with the complaint.  Those were labeled as numbered exhibits for "2nd SW."  The record shows an earlier complaint had

- 2 -

also been filed by Strebing on January 25, 2022, seeking to enter the common areas of 1708 Springfield Road for purposes of surveillance.

¶ 8            The complaint and attachments showed on December 28, 2021, the source told Strebing about being at the apartment of a person known as Wallace on Orchard Road in Bloomington. At that apartment, the source was introduced to a group of individuals involved in ongoing illegal drug sales involving purported cocaine in the Bloomington area. Two of the individuals identified were defendant and Eric Seymon. The source indicated defendant and Seymon were "almost always together" and believed Seymon worked for defendant. Defendant and Seymon had previously been seen in a white car and a gray minivan. The group of individuals gave the source Seymon's phone number. Strebing reported there were five controlled buy transactions of purported cocaine with defendant and/or Seymon.

¶ 9            The first controlled buy occurred on January 7, 2022. Before the buy, the source had numerous missed calls from an unknown number. The source called the number back, and defendant answered the phone and identified the number as his new phone number. Defendant asked if the source needed any crack cocaine. Using defendant's phone number, the source arranged the first controlled buy at the source's apartment on Orchard Road, which resulted in the source purchasing 0.3 grams of purported cocaine. At trial, the parties stipulated the substance was 0.2 grams of cocaine. Surveillance logs noted defendant arrived in a silver Buick minivan.

¶ 10            After the transaction, which occurred at approximately 17:20, defendant drove to Thorton's gas station and then to the parking lot of the Hillside apartment complex at 1700 Springfield Road, arriving at 17:45. A short time later, the Buick drove to the 300 block of

Erickson Street, where a black female exited the driver's seat and entered 301 Erickson Street alone.

¶ 11　　　　On January 12, 2022, the source contacted defendant using his cell phone number and arranged the second controlled buy. Defendant directed the source to the 1200 block of Orchard Road. The record indicates the location was not the source's apartment. The source was met by a black male wearing a black coat, blue jeans, and a medical mask. The source believed the person to be Seymon. Strebing averred the transaction resulted in the sale of 0.8 grams of a substance that tested inconclusive for cocaine.

¶ 12　　　　On January 17, 2022, the source spoke with Seymon using Seymon's cell phone number. The source asked to buy cocaine, and Seymon directed the source to the Hillside apartments at 1708 Springfield Road. Seymon later changed the location to 1714 Springfield Road, stating it was the first building. The source arrived and stood in front of the common door to 1718 Springfield Road. Seymon called the source and said he was on Orchard Road but would be at Springfield Road in 5 to 10 minutes. About 15 minutes later, the source called Seymon's phone, and a female answered. The female said Seymon would be there soon. The controlled buy occurred between the source and Seymon in a common hallway area of the apartment building at 1718 Springfield Road.

¶ 13　　　　Before the controlled buy, the surveillance unit stationed on Springfield Road observed activity by defendant, Seymon, and a female identified as Tikeybeya Sims in the parking lot of the apartment building, along with a gray Jeep bearing an Illinois license plate registered to Sims. The registration for Sims's Jeep listed the address as Apartment No. 7 at 1708 Springfield Road in Bloomington. Surveillance logs associated with the third controlled buy stated, at 14:03-14:06, defendant and Sims were seen exiting the common door of the

apartment building at 1708 Springfield Road and walking to the gray Jeep. They walked back and forth between the common door and the Jeep and then entered the building and appeared to walk up a staircase from the common hallway. At 14:05, the source exited a vehicle in front of 1718 Springfield Road and waited just inside the common door at 1718 Springfield Road. At 14:09, Sims exited the common door at 1708 Springfield Road, walked to the Jeep, and drove out of the parking lot. Defendant watched Sims drive away from the common hallway just inside the common door. At 14:27, a silver Dodge Durango arrived at 1708 Springfield Road. Seymon exited the rear passenger door and walked inside the common door of 1708 Springfield Road. The Dodge then left the area. At 14:32, Seymon walked between the buildings at 1716 and 1718 Springfield Road and entered the common door at 1718 Springfield Road, where he met with the source and made the controlled buy of 0.8 grams of purported crack cocaine.

¶ 14　　　　　On January 24, 2022, Seymon called the source and offered to sell cocaine. Seymon told the source he was at Springfield Road and said he could come to Orchard Road if needed. Surveillance logs show Seymon told the source at 13:38 to come to Springfield Road. At 14:06, Seymon told the source he would come to Orchard Road. Seymon arrived in the Orchard Road area at 14:10. The transaction took place at Wallace's apartment and resulted in the sale of 0.1 grams of crack cocaine. Surveillance logs showed between 14:33 and 15:45, Seymon left the area and drove to the apartments at 1708 Springfield Road. He left Springfield Road at 15:55.

¶ 15　　　　　In the complaint, Strebing averred that, on January 25, 2022, the source arranged to meet Seymon at an address on Orchard Road. Strebing averred earlier surveillance observed Seymon exit Apartment No. 7 at 1708 Springfield Road with an unknown female and child and leave in a red Chevrolet. Seymon arrived at the location of the controlled buy in the same

- 5 -

vehicle. The controlled buy resulted in the purchase of 0.3 grams of purported cocaine. After the transaction, Seymon went back to Apartment No. 7 at 1708 Springfield Road. Surveillance logs for the controlled buy do not appear in the record directly attached to the complaint. However, they do appear in the record just before the second search warrant complaint labeled as exhibits for "SWR." The surveillance log shows, on January 25, 2022, at 15:56, investigators installed a camera inside 1708 Springfield Road. That camera recorded Seymon leaving 1708 Springfield Road at 16:26, before the controlled buy, and returning after the controlled buy at 17:14. The controlled buy at Orchard Road occurred between 16:50 and 16:52.

¶ 16        Strebing averred investigators remained in the area, maintained constant surveillance of 1708 Springfield Road, and observed Seymon leave Apartment No. 7. Strebing alleged, given that Seymon entered Apartment No. 7 before the January 25, 2022, controlled buy and returned to the apartment immediately following the controlled buy, there was a reasonable inference items relating to ongoing illegal drug activity were present in the apartment. He further averred, based on his training and experience in drug investigations, he was aware controlled substances, drug proceeds, and drug distribution materials and related items can be and are typically hidden through so-called "drug houses" in "such residence locations." He was also aware drug transactions are often initiated via cell phones.

¶ 17        The trial court issued a search warrant, which resulted in the seizure of crack cocaine, cash, digital scales, and other related items from Apartment No. 7 at 1708 Springfield Road. Although the record shows recorded controlled-buy money was recovered, the record indicates the money was from transactions not at issue in the case, and evidence at trial did not tie that money to defendant. The apartment was leased to Sims, but bank cards and court

paperwork belonging to defendant were found in a bedroom of the apartment. Defendant's cell phone was also found there.

¶ 18    Defendant was arrested and charged with two counts of unlawful delivery of less than one gram of a controlled substance and unlawful possession of less than one gram of a controlled substance with intent to deliver. It was later determined one of the substances at issue was actually breadcrumbs. Defendant was then additionally charged with unlawful delivery of a look-alike substance. Defense counsel never filed a motion to suppress evidence based on the search warrant.

¶ 19                B. Evidence of Other Bad Conduct and Trial

¶ 20    Before trial, the State filed a motion *in limine* seeking to introduce evidence of other crimes for the purpose of proving identity. The State alleged defendant directly conducted the January 7, 2022, controlled buy and appeared to be wearing a ski mask in a surveillance video, which put identity at issue. The State alleged that, several hours after the controlled buy, defendant had contact with police at a mall in Bloomington after store employees believed he had used a stolen credit card. Video from police body cameras showed defendant was wearing the same "distinctive outfit" as was worn during the controlled buy earlier that day. Thus, the State sought to use the evidence for purposes of showing identity. The State also sought to introduce evidence of the buy money found at defendant's apartment.

¶ 21    At a hearing on the motion, the State argued, as to the count pertaining to the January 7, 2022, transaction, identity was a critical issue and evidence related to a police officer's observation of defendant at the mall was probative evidence. The State indicated that it would be willing to crop photographs stemming from the incident to minimize the prejudicial impact. The trial court found photographs from the incident would be admissible, provided they

- 7 -

did not show defendant in front of a police car or handcuffed. The court reserved ruling on the issue of the buy money, indicating it was concerned about relevance. The State ultimately did not rely on the recovered buy money as evidence at trial.

¶ 22 Also before trial, the trial court inquired whether the parties anticipated presenting evidence requiring a limiting instruction. The State told the court it had prepared Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14) regarding proof of other offenses or conduct but took no position as to whether it should be given to the jurors at the time of the related testimony or during the final instructions. Defense counsel requested IPI Criminal No. 3.14 be given only at the close of the case. During its opening remarks, the State told the jurors identity was at issue because, during the January 7, 2022, controlled buy, the seller wore a ski mask. However, he was wearing a "distinctive outfit" similar to an outfit police observed defendant wearing later that night at the mall. The State told the jurors it was not going to get into any reasons for why the police observed defendant.

¶ 23 At trial, the source identified photos of defendant and Seymon and identified defendant in court. The source testified about meeting defendant at a neighbor's house and stated she asked for defendant's phone number. The source stated the January 7, 2022, controlled buy occurred after the source called defendant's phone number. The source stated defendant arrived, and the source captured video of defendant which showed him walking around the source's apartment. The video was admitted into evidence. Although the video is of poor quality, between 19:55 and 20:06, the video shows a person wearing a dark hooded jacket with a red shirt underneath with a logo on the front of the shirt. When asked if defendant was wearing a mask, the source said, "I think so." The source was unable to recall what else he was wearing.

¶ 24    The State also presented surveillance video evidence from Thorton's gas station taken shortly after the controlled buy showing defendant wearing a dark jacket with a red shirt underneath with what appears to be the same logo on the shirt, but with the face mask rolled up and worn like a beanie. The surveillance officer also testified defendant was wearing a black jacket and red shirt with some kind of image or emblem on it. Strebing testified the source arranged the January 7, 2022, controlled buy over a speakerphone, and Strebing recognized defendant's voice as the person the source was speaking to.

¶ 25    Bryan McCall, a Bloomington police officer, testified he encountered defendant at the mall on January 7, 2022, in connection with a call for service. As part of that call, he looked at defendant's identification card. McCall identified photographs from his body camera of defendant wearing clothing matching the description given by the surveillance officer and which showed defendant wearing a dark jacket with a red shirt underneath bearing a logo matching the shirt seen in the video taken in the source's apartment and the images taken at Thorton's. On cross-examination, defense counsel established defendant was searched but ultimately never charged with a criminal offense at the mall. Counsel further established defendant did not have any drugs and McCall did not find any marked buy money on him. Counsel then asked if defendant was searched multiple times. The officer replied defendant was searched once because of his parole status and a second time after he was placed in custody.

¶ 26    Because the sufficiency of the evidence to prove defendant guilty beyond a reasonable doubt is not at issue on appeal, we need not provide an extensive recitation of the remainder of the evidence. Overall, the evidence showed Seymon lived on Orchard Road and had a reciprocal drug dealing arrangement with defendant. Seymon acted on behalf of defendant during the controlled buy involving the delivery of a look-alike substance and identified text

messages between himself and defendant about the transaction. Personal items belonging to defendant were found in Apartment No. 7 on Springfield Road, and the record indicates he stayed there with Sims. Strebing also testified surveillance had seen defendant come out of the apartment, and Strebing believed defendant lived there or stayed there.

¶ 27 During the jury instruction conference, the State tendered IPI Criminal No. 3.14. The trial court stated it assumed the instruction was related to defendant's encounter with the police at the mall. The State responded it was, and defense counsel stated he had no objection. As a result, the jury was instructed as follows:

"Evidence has been received that the defendant has been involved in conduct other than those charged in the Indictment. This evidence has been received on the issues of the defendant's identification, and may be considered by you only for that limited purpose. It is for you to determine whether the defendant was involved in that conduct; and, if so, what weight should be given to this evidence on the issue of identity."

¶ 28 During closing arguments, defense counsel stressed neither buy money nor drugs were ever found on defendant after any of the transactions. Later in his argument, counsel repeated that, on January 7, 2022, the police at the mall did not find marked buy money on defendant and defendant was not arrested. Counsel argued if the police believed a drug deal happened on January 7, 2022, someone would have arrested defendant. Counsel then repeated, "[I]t happens, they do have [an] encounter with him. He has no drugs on him at the mall. And there is no buy money found on him and confirmed at any point in time here anywhere, all day long." Counsel later argued, "It is rare, rarer when in a drug dealing case the defendant is never

- 10 -

found with buy money, controlled money on them, on their place, in their car. And [defendant] was never found with buy money, controlled buy money."

¶ 29       The jury found defendant guilty. The trial court sentenced him to 13 years' imprisonment for unlawful delivery of a controlled substance and unlawful possession of a controlled substance with intent to deliver. The court sentenced him to five years' imprisonment for unlawful delivery of a look-alike substance. Defendant filed a motion for judgment notwithstanding the verdict or for a new trial, arguing the State failed to prove him guilty beyond a reasonable doubt. The court denied the motion.

¶ 30       This appeal followed.

¶ 31                    II. ANALYSIS

¶ 32       On appeal, defendant contends his counsel rendered ineffective assistance when counsel (1) failed to file a motion to suppress evidence seized from the apartment defendant shared with his girlfriend, (2) elicited testimony about irrelevant other crimes or bad conduct, and (3) did not object to an instruction limiting the jury to considering the evidence for purposes of establishing identity.

¶ 33                    A. Failure to File a Motion to Suppress

¶ 34       Defendant first contends his counsel rendered ineffective assistance by failing to move to suppress the evidence seized as a result of the search warrant. In particular, relying on *People v. Manzo*, 2018 IL 122761, 129 N.E.3d 1141, defendant argues the complaint for the search warrant and its accompanying exhibits failed to establish a sufficient nexus between defendant's criminal activity and Apartment No. 7 at 1708 Springfield Road.

¶ 35       Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23, 965

N.E.2d 1109, 1115. "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). A defendant must satisfy both prongs of the *Strickland* standard, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010).

> "In order to establish prejudice resulting from failure to file a motion to suppress, a defendant must show a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had the evidence been suppressed. [Citation.] The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile." *People v. Patterson*, 217 Ill. 2d 407, 438, 841 N.E.2d 889, 907 (2005).

¶ 36 Under the fourth amendment to the United States Constitution (U.S. Const., amend. IV), made applicable to state officials through the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV):

> " 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' " *Manzo*, 2018 IL 122761, ¶ 26 (quoting U.S. Const., amend. IV).

Similarly, under the search and seizure clause of the Illinois Constitution:

> " 'The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or

interceptions of communications by eavesdropping devices or other means. No

warrant shall issue without probable cause, supported by affidavit particularly

describing the place to be searched and the persons or things to be seized.' "

*Manzo*, 2018 IL 122761, ¶ 27 (quoting Ill. Const. 1970, art. I, § 6).

¶ 37    With a narrow exception not relevant in this case, our supreme court has held the search and seizure provision in article I, section 6, of the Illinois Constitution is to be interpreted in lockstep with the fourth amendment. *Manzo*, 2018 IL 122761, ¶ 28. "The fourth amendment and the Illinois search and seizure clause, then, both set forth two underlying requirements: that searches and seizures must be reasonable and that probable cause must support search warrants." *Manzo*, 2018 IL 122761, ¶ 28.

¶ 38    Under both federal and state warrant requirements, a detached judicial officer must resolve the question of whether probable cause exists to justify issuing a warrant. *Manzo*, 2018 IL 122761, ¶ 29. Whether probable cause exists in a particular case depends on the " 'totality of the circumstances and facts known to the officers and court when the warrant is applied for.' " *Manzo*, 2018 IL 122761, ¶ 29 (quoting *People v. Free*, 94 Ill. 2d 378, 400, 447 N.E.2d 218, 228 (1983)). The "facts and circumstances within the affiant's knowledge at the time the warrant is applied for" must be " 'sufficient to warrant a person of reasonable caution to believe that the law was violated and evidence of it is on the premises to be searched.' " *Manzo*, 2018 IL 122761, ¶ 29 (quoting *People v. Griffin*, 178 Ill. 2d 65, 77, 687 N.E.2d 820, 829 (1997)). "It is the probability of criminal activity, rather than proof beyond a reasonable doubt, that is the standard for determining whether probable cause is present." *Manzo*, 2018 IL 122761, ¶ 29.

¶ 39 "Whether the necessary probability exists is governed by commonsense considerations that are factual and practical, rather than by technical rules." *Manzo*, 2018 IL 122761, ¶ 30.

> " 'The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Manzo*, 2018 IL 122761, ¶ 29 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

¶ 40 A reviewing court will not substitute its judgment for that of the magistrate in construing an affidavit. *Manzo*, 2018 IL 122761, ¶ 31. Instead, the court merely decides whether the magistrate had a substantial basis for concluding probable cause existed. *Manzo*, 2018 IL 122761, ¶ 31. "A sworn complaint supporting a search warrant is presumed valid." *Manzo*, 2018 IL 122761, ¶ 32. "Moreover, in determining whether an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases should largely be determined by the preference to be accorded to the warrants." *Manzo*, 2018 IL 122761, ¶ 31. Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).

¶ 41 With regard to the search of an individual's home, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). There must be a nexus between the place to be searched and the evidence sought. *Manzo*, 2018 IL 122761, ¶ 35.

¶ 42        In *Manzo*, our supreme court found probable cause for a search warrant was lacking based on the failure of the State to show a nexus between the premises searched and evidence of illegal activity. There, the complaint for the search warrant did not target the defendant but sought a warrant to search his residence. The complaint focused on three undercover cocaine purchases from an individual named Casillas who was the cousin of Leticia Hernandez, the defendant's then girlfriend and future wife. *Manzo*, 2018 IL 122761, ¶ 4. The purchases occurred over a period of 20 days preceding the issuance of the search warrant, and two of the purchases occurred "in the vicinity" of the defendant's residence. *Manzo*, 2018 IL 122761, ¶ 5. For one of the purchases, Casillas drove a vehicle registered to Hernandez at the address of the defendant's home. *Manzo*, 2018 IL 122761, ¶ 6. For another purchase, surveillance officers saw Casillas exit the defendant's residence on foot and walk to meet the undercover officer at the nearby grocery store. *Manzo*, 2018 IL 122761, ¶ 8. Law enforcement records showed Casillas was "an associate" of Hernandez but did not further explain the meaning of that term. *Manzo*, 2018 IL 122761, ¶ 9. The complaint for the search warrant alleged, based on those facts, the officers had probable cause to believe a search of the defendant's residence would result in the seizure of cocaine, currency, drug records, drug packaging, drug paraphernalia, and other evidence related to drug crimes. *Manzo*, 2018 IL 122761, ¶ 4. The appellate court held the warrant was based on probable cause, but our supreme court disagreed. *Manzo*, 2018 IL 122761, ¶ 36.

¶ 43        The supreme court in *Manzo* recognized "the fact that a dealer leaves his home to complete a drug sale makes it more likely that he possessed drugs at his home." *Manzo*, 2018 IL 122761, ¶ 52 (citing *United States v. Aguirre*, 664 F.3d 606 (5th Cir. 2011); *United States v. Montes-Medina*, 570 F.3d 1052 (8th Cir. 2009); *United States v. Dessesaure*, 429 F.3d 359 (1st

- 15 -

Cir. 2005); *State v. Saine*, 297 S.W.3d 199 (Tenn. 2009); *Holmes v. State*, 796 A.2d 90 (Md. 2002)). However, the court held the fact Casillas was seen leaving the defendant's home before one of the undercover buys and his use of a vehicle registered to Hernandez at the defendant's residence for another undercover buy failed to establish a sufficient nexus between Casillas's criminal conduct and the defendant's residence. *Manzo*, 2018 IL 122761, ¶¶ 38-39. The court noted, although Casillas used a vehicle registered to Hernandez at the defendant's residence, "There [was] no evidence indicating where Casillas was before arriving at the drug deal in [the] vehicle. In particular, there was no evidence that Casillas drove [the] vehicle directly from [the] defendant's home to meet [the undercover officer]." *Manzo*, 2018 IL 122761, ¶ 40.

¶ 44    The supreme court also noted the fact Casillas left the defendant's home to complete a drug sale established that Casillas had drugs on his person when he left the defendant's house, but "it [did] not follow that Casillas obtained those drugs from defendant's home as opposed to any other place." *Manzo*, 2018 IL 122761, ¶ 48. The court stated, "Without more information connecting defendant's home to the drug sale, it is equally possible to infer that Casillas had the drugs on his person when he arrived at defendant's home." *Manzo*, 2018 IL 122761, ¶ 48. Moreover, the court observed no evidence was presented in the complaint for the search warrant that the location to be searched was the defendant's home, or that Casillas was a frequent visitor there. *Manzo*, 2018 IL 122761, ¶ 39. Notably absent from the complaint were allegations Casillas lived in the residence searched, stored narcotics there, or conducted any drug transactions inside the residence. *Manzo*, 2018 IL 122761, ¶ 51. At best, the complaint established Casillas was an acquaintance of the occupants of the residence and did not establish a nexus to believe evidence of Casillas's illegal activities would be found there. *Manzo*, 2018 IL 122761, ¶ 51.

¶ 45        The supreme court further observed although law enforcement records showed Casillas was an "associate" of Hernandez, the connection between them was not further explained and there was no evidence Hernandez had any involvement in illegal activities. Thus, that statement on its own did not create an inference Casillas and Hernandez engaged in drug dealing together, let alone that Casillas was storing evidence of drug dealing at the defendant's home. *Manzo*, 2018 IL 122761, ¶ 39.

¶ 46        Additionally, the supreme court in *Manzo* found it significant the affiant officer requesting the search warrant did not describe his experience with drug investigations and arrests. *Manzo*, 2018 IL 122761, ¶ 60. Notably, the *Manzo* court distinguished the case from *Commonwealth v. Clagon*, 465 Mass. 1004, 987 N.E.2d 554 (2013), a case in which the affiant officer described his experience in drug investigations and arrests, attesting he was familiar with drug distribution tactics, including a delivery service whereby a distributor conceals a supply of controlled substances at his residence and conducts sales to individual buyers at other locations. *Manzo*, 2018 IL 122761, ¶ 54 (citing *Clagon*, 465 Mass. at 1004-05, 987 N.E.2d at 555-56). The affidavit in *Clagon* also suggested the defendant was an established drug dealer with an ongoing, regular trade, which was corroborated by controlled purchases where the defendant produced heroin within a short time after receiving a call from a confidential source. Further, the affidavit established the defendant's connection to the premises. The defendant in *Clagon* twice left the premises and went directly to the drug sale and, on a third occasion, was seen returning to the premises after the drug sale. *Manzo*, 2018 IL 122761, ¶ 54 (citing *Clagon*, 465 Mass. at 1004-05, 987 N.E.2d at 555-56). Likewise, the *Manzo* court also distinguished additional cases in which the affiant officer averred to his or her expertise. See *Manzo*, 2018 IL 122761, ¶¶ 55-59 (discussing cases).

¶ 47          Here, the facts are distinguishable from those in *Manzo*.  Indeed, the facts are closer to those of *Clagon*, which the *Manzo* court had specifically distinguished.  First, unlike in *Manzo*, defendant here was a direct target of the investigation and his involvement in illegal activity and association with Seymon was well documented.  Strebing provided evidence defendant and Seymon were part of a group selling purported cocaine, defendant and Seymon were almost always together, and the source believed Seymon worked for defendant.  It was also established defendant was involved in drug activity in general, as he personally conducted the first controlled buy and arranged the second one.

¶ 48          Second, while none of the controlled buys occurred inside of Apartment No. 7 at 1708 Springfield Road, one did occur in a common hallway of a building in the apartment complex at a time when defendant was established to be present in the area within minutes of the sale.  This differs from the circumstance in *Manzo*, where the sale took place at businesses "in the vicinity" of the residence.  See generally *People v. Aquisto*, 2022 IL App 4th 200081, ¶¶ 68-70, 205 N.E.3d 812 (distinguishing *Manzo* when a drug sale took place in the backyard of the target residence).  Here, the sale occurred in very near proximity to the residence searched. Further, Seymon was dropped off immediately before a transaction and entered 1708 Springfield Road before exiting again and meeting the source in the common hallway of another building to complete the transaction.  When considered in light of other facts in the complaint, there was a reasonable inference he went to Apartment No. 7 before that transaction.

¶ 49          Further, surveillance generally connected multiple sales of cocaine to the Hillside apartment complex.  After the first controlled sale, defendant was observed returning to the apartment complex.  The January 17, 2022, transaction occurred in a common hallway in the complex.  On January 24, 2022, Seymon told the source he was at Springfield Road before he

went to Orchard Road for the transaction. He then returned to 1708 Springfield Road after that transaction. Then, Seymon's delivery of cocaine on January 25, 2022, was directly connected to Apartment No. 7 at 1708 Springfield Road when he was observed leaving that location before a transaction and returning there immediately after. This is far different from the facts of *Manzo*, where there was a lack of evidence of a connection between the defendant and the person performing the drug sales and a lack of evidence tying the person making the sales to the defendant's residence both immediately before and after drug sales.

¶ 50          Finally, unlike in *Manzo*, where the affiant officer failed to establish expertise in investigating drug transactions, Strebing did so. Strebing specifically averred, based on his training and experience in drug investigations, he was aware controlled substances, drug proceeds, and drug distribution materials and related items can be and are typically hidden through so-called "drug houses" in "such residence locations." He was also aware drug transactions are often initiated via cell phones.

¶ 51          Defendant argues *Manzo* applies because the State failed to connect Sims, as the person named in the apartment lease, to defendant or Seymon. But defendant's argument ignores that in *Manzo*, the only significant connection between the person selling drugs and the location searched was a seemingly innocent relationship with a third person. There was a lack of evidence the seller was keeping drugs in the third-person's home. As previously noted, with regard to the search of an individual's home, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). Here, both Seymon and defendant were directly connected to controlled buys associated with the Hillside apartments. It

was unnecessary to also connect them to Sims, or for the complaint to allege Sims dated defendant or Sims was involved in the drug deals. It was enough the evidence showed Seymon and defendant worked together as part of a group selling purported cocaine and 1708 Springfield Road was frequented by them in close temporal proximity to multiple drug transactions.

¶ 52 Apartment No. 7 was also specifically identified as the pertinent residence. Defendant contends the surveillance logs connecting the transactions to Apartment No. 7 were missing from the exhibits considered by the trial court when it issued the warrant. The record indicates those exhibits were perhaps not included with the operative search-warrant complaint. However, Strebing averred to the contents of them, including averring Seymon exited Apartment No. 7 before a drug transaction and returned there immediately after the transaction. Those actions provided a reasonable inference items relating to ongoing illegal drug activity were present in the apartment.

¶ 53 Under these circumstances, we find *Manzo* distinguishable and determine the complaint for the search warrant established probable cause. Accordingly, counsel's performance was not deficient, as it would have been futile for counsel to file a motion to suppress.

¶ 54 B. Other Bad-Conduct Evidence

¶ 55 Defendant next contends his trial counsel rendered ineffective assistance by eliciting irrelevant instances of other bad conduct and then failing to object to IPI Criminal No. 3.14, further drawing attention to the evidence.

¶ 56 Defendant does not argue allowing McCall's testimony and the images portraying defendant's clothing was in error. Instead, he notes the State never elicited evidence of any misconduct, thus negating any relevance of IPI Criminal No. 3.14. He argues it was his counsel

who raised the issue of misconduct and allowed testimony defendant was on parole, searched, and placed in custody, which then allowed the instruction to be given, drawing additional attention to those facts.

¶ 57        Generally, evidence of a defendant's prior crimes or bad conduct is inadmissible because it is so persuasive of a defendant's propensity to commit crimes that it becomes unfairly prejudicial.  See *People v. Donoho*, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714 (2003).  Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) permits character evidence for "purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  However, such evidence "may still be excluded from evidence if its prejudicial effect substantially outweighs its probative value."  *People v. Petrakis*, 2019 IL App (3d) 160399, ¶ 22, 128 N.E.3d 1053; see Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 58        Counsel's effectiveness is determined by the totality of his conduct, and, as a court of review, we will not inquire into areas involving the exercise of judgment, discretion, trial tactics, or strategy.  *People v. Edwards*, 301 Ill. App. 3d 966, 981, 704 N.E.2d 982, 994 (1998).  There is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.  Further, counsel's decision as to what jury instructions to tender is one of several determinations widely recognized as matters of trial strategy.  *People v. Lowry*, 354 Ill. App. 3d 760, 766, 821 N.E.2d 649, 557 (2004).

¶ 59        Here, counsel's decision to elicit testimony about McCall's search of defendant was presumed to be strategy.  The record shows counsel used that testimony to show, despite several searches, defendant did not have drugs or buy money on his person after the January 7, 2022, controlled buy.  At that point, it was reasonable for the jury to be given IPI Criminal No.

3.14 to minimize any prejudice arising from the inference that, because defendant was detained and searched, he committed other crimes or bad conduct.

¶ 60 Further, to the extent counsel should have prevented or objected to McCall's statements about defendant's parole status and being placed in custody, defendant has not demonstrated how he was prejudiced by that testimony. The evidence merely consisted of a passing remark. Further, the evidence was also clear defendant was not arrested, and the use of IPI Criminal No. 3.14 specifically instructed the jury to consider the evidence only for purposes of establishing identity.

¶ 61 Meanwhile, the evidence of defendant's guilt was overwhelming. Defendant was clearly identified as the person who sold the source cocaine on January 7, 2022. Aside from evidence showing defendant wearing the same or similar clothing at the controlled buy, the gas station, and the mall, the source testified the buy was arranged using defendant's phone number. Then, Strebing testified he recognized defendant's voice on the call. As to the other transactions, Seymon testified about his reciprocal arrangement with defendant, including defendant's involvement with the sale of look-alike drugs. Evidence was also found in Apartment No. 7 at 1708 Springfield Road supporting defendant's possession of drugs with intent to deliver. Defendant points to various weaknesses in the State's case to argue otherwise. However, we disagree a fleeting reference to defendant's parole status and being searched, coupled with an instruction limiting the jury's consideration of such evidence to the issue of identity, shows the result of the proceedings would have been different in its absence. Accordingly, defendant has not shown counsel rendered ineffective assistance. See *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 60, 145 N.E.3d 544.

¶ 62 III. CONCLUSION

¶ 63  For the reasons stated, we affirm the trial court's judgment.

¶ 64  Affirmed.